1

2

3

4

5

6

7

8

9

10          **IN THE UNITED STATES DISTRICT COURT**

11          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

12

13   ROXANNE AYALA, et. al,                    CASE NO. CV-F-02-5846-LJO

14                  Plaintiff,          _____**DECISION ON DEFENDANTS' SUMMARY**
                                        **JUDGMENT MOTION**
15          vs.                         (Doc. 107.)

16   KC ENVIRONMENTAL HEALTH, et al.,

17                  Defendant.
     _____/

18

19                           **INTRODUCTION**[1]

20          In this malicious prosecution action under 42 U.S.C. § 1983 ("section 1983"), defendants City

21   of Bakersfield ("City") and City code enforcement officer Terry Buss ("Mr. Buss") seek summary

22   judgment on grounds that plaintiffs Leroy Edwards, Kenneth Edwards and Roxanne Ayala (collectively

23   "plaintiffs") are unable to establish elements of their claims and that Mr. Buss is shielded by immunities.

24   Plaintiffs filed no timely opposition papers, and this Court's January 6, 2006 order denied plaintiffs'

25   belated ex parte request to extend the opposition deadline in the absence of good cause for an extension.

26   _____

27          [1]      Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties consented to proceed before a United States
     Magistrate Judge, and by a September 27, 2004 order, this action was assigned to United States Magistrate Judge Lawrence
28   J. O'Neill for all further proceedings.

                                        1

1   This Court further deemed the City and Mr. Buss' summary judgment motion submitted on the pending

2   record and vacated the January 13, 2006 hearing.[2]  For the reasons discussed below, this Court GRANTS

3   the City and Mr. Buss summary judgment.

4                                              **BACKGROUND**

5                                              **The Parties**

6           Plaintiff Leroy Edwards ("Leroy") is the father of plaintiffs Kenneth Edwards ("Kenneth") and

7   Roxanne Ayala ("Ms. Ayala").  Ms. Ayala owns and operates Action Sewer Pumping ("ASP"), a septic

8   pumping business.  ASP's sewer pumping trucks pump contents of residential and commercial septic

9   tanks into containers on the trucks and transport the contents to a disposal site. ASP also rents and

10  maintains portable chemical toilets.  During 1999-2001, Leroy and Kenneth performed work for ASP,

11  including driving ASP trucks.  Kenneth owns and operates American Pumping, a non-septic pumping

12  business.

13          As a code enforcement officer, Mr. Buss enforces the City municipal code and California Health

14  & Safety Code and Code of Regulations and investigates related wrongdoing.  Mr. Buss has no criminal

15  prosecution training and has not prosecuted criminal defendants.  Defendant Kern County Environmental

16  Health Services Department("EHS") is a Kern County agency with authority to regulate businesses such

17  as those of plaintiffs.  Defendant William O'Rullian ("Mr. O'Rullian") is an EHS health specialist and

18  solid waste program supervisor.  Defendant Terry Gray ("Mr. Gray") is an EHS environmental health

19  technician.

20                                          **Property Inspections**

21          Kenneth owns nearly 20 acres of vacant land on Cottonwood Road in a heavy industrial zoned

22  area of Bakersfield ("Cottonwood property").  Kenneth allowed ASP to designate the property as a

23  storage site for trucks and to store trucks on the property.  Leroy has leased and used property on Union

24  Avenue in Bakersfield ("Union property") to store used equipment, machinery and vehicles subject to

25  a pre-existing use exception to the current zoning for the area.  In May 2000, based on information from

26

27          [2]       In the absence of plaintiffs' opposition, this Court carefully reviewed and considered the entire record to
    determine whether the City and Mr. Buss' summary judgment/adjudication motion is well supported.  Omission of reference
    to an argument, document, or paper is not to be construed to the effect that this Court did not consider the argument,

28  document or paper.

                                                      2

Mr. Gray, Mr. Buss suspected that plaintiffs operated an illegal junk yard and sewage transfer station on the Cottonwood property. Mr. Buss obtained an inspection warrant for the Cottonwood property and signed by a Kern County Superior Court judge.

On June 7, 2000, Mr. Buss, several other City code enforcement officers, and other law enforcement offices executed the warrant at the Cottonwood property. According to Mr. Buss, he observed three pump trucks containing sewage with several discarded hoses on the ground, a sewage puddle, heavy equipment, truck tractors, pickup trucks, vacuum, mobile home and other trailers, cars, trash, debris, piles of asphalt, six tanks of fluid, dilapidated vacuum trucks containing fluids, a soap drum leaking fluids, numerous car batteries, discarded motor oil buckets, drums of sulfuric acid, septic tanks containing oily substance, a hose protruding from a vacuum truck on the ground, fluids in puddles, a large tank leaking water, and tanks containing no less than 9,000 gallons of sewage and fluids with hoses to potentially cause spillage. Mr. Buss photographed the area. Liquid and soil samples of sewage were taken and submitted for lab testing.

Mr. Buss' June 9, 2000 letter directed Kenneth, Ms. Ayala and ASP to cease business operations and to remove sewage and debris from the Cottonwood property. Mr. Buss further noted the City's continuing investigation. A June 19, 2000 inspection of the Cottonwood property revealed a large semi and vacuum trailer, which appeared to contain liquid waste, along with pump trucks and contained sewage. June 15 and 27, 2000 lab results were positive for constituents of crude/waste oil.

EHS initiated a proceeding to revoke ASP's sewage pumping vehicle and toilet rental agency health permits ("health permits"). EHS's August 14, 2000 notice indicated the presence on the Cottonwood property of two pumping trucks leaking sewage from hose connections and containing crude/waste oil, discharged contents of a vacuum trailer, and 20,000 gallons of sewage or sewage/industrial waste mixture. EHS ordered ASP to immediately cease operation of a sewage pumping business and sewage storage, to remove all tank sewage to an approved disposal site, and to provide documentation of such removal. EHS also revoked ASP's health permits.

Mr. Buss conducted a November 2, 2000 inspection of the Cottonwood property and found large amounts of debris, including trash, building materials and junk vehicles. Mr. Buss noted that the Cottonwood property was in continuing violation of permitted uses and that plaintiffs had not filed a site

3

plan with the City Planning Department.  An April 12, 2001 inspection of the Cottonwood property revealed continued presence of debris, trucks and trailers.  Plaintiffs had not submitted a site plan to render the Cottonwood property in violation of permitted uses.

## Criminal Action Against Plaintiffs

On April 12, 2001, a four-count criminal complaint ("criminal complaint") was filed and signed by Mr. Buss upon information and belief and under penalty of perjury to initiate a Kern County Superior Court criminal action ("criminal action") against plaintiffs.  Count one alleged plaintiffs unlawfully conspired to violate several California Health and Safety Code and Penal Code sections (misdemeanors and felonies) addressing transport and disposal of hazardous waste and fraudulent receipt of money for services.  Count two alleged plaintiffs committed a felony by violating California Health and Safety Code section 25189.5 (disposal, treatment, storage or transportation of hazardous waste without permits or at unauthorized points).  Count three alleged plaintiffs committed a felony by violating California Penal Code section 182(a)(4) to conspire unlawfully to defraud Shirley Kinney ("Mrs. Kinney") and Irma Honeycutt ("Ms. Honeycutt") and to obtain money by false pretenses in connection with a January 21, 2001 septic pumping job for Ms. Kinney and Ms. Honeycutt.  Count four alleged plaintiffs committed a felony by violating California Penal Code section 182(a)(5) and unlawfully conspired to commit acts injurious to public health.

Kern County Deputy District Attorney Craig O. Smith ("Mr. Smith") prepared the criminal complaint and presented it to Mr. Buss to sign.  In his declaration, Mr. Smith states that he solely decided whether to file the criminal complaint, whom to charge with crimes, the types of violations for which to prosecute plaintiffs, and whether to charge plaintiffs with felonies or misdemeanors. Mr. Smith decided to prosecute count two after review of documentation from Mr. Buss and Mr. O'Rullian and including written reports, photographs, interviews and lab results.  Mr. Smith visited and viewed the Cottonwood and Union properties (collectively "properties").  Mr. Smith declares that the "spillage of sewage was an instrumental factor in my decision to prosecute."  Mr. Smith declares that he conducted an independent investigation regarding count three and including interviews with Ms. Kinney and Ms. Honeycutt.

In their declarations, Mr. Smith and Mr. Buss note that Mr. Buss had no involvement in

4

1   preparation of the criminal complaint and that Mr. Smith unilaterally filed the criminal complaint

2   without Mr. Buss' influence.  Mr. Buss declares he submitted no information relative to count three

3   (conspiracy to defraud) and in particular, no information regarding Leroy and Kenneth's January 21,

4   2001 septic pumping job for Ms. Kinney and Ms. Honeycutt to give rise to count three.  Mr. Buss further

5   declares that in signing the criminal complaint, he relied on Mr. Smith and Mr. Smith's office as to

6   whether to charge plaintiffs, whom to charge with particular crimes, the types of violations for which

7   to prosecute plaintiffs, and whether to charge plaintiffs with felonies or misdemeanors.

8          April 12, 2001 felony arrest warrants were issued for plaintiffs and set a $20,000 bail.

9          On April 26, 2001, Lara Kimm ("Ms. Kimm"), an employee with the wastewater division of the

10  City's Public Works Department, sent Mr. Smith a fax to note that although liquid and soil samples

11  taken from the Cottonwood property on June 7, 2000 were positive for a constituent of crude/waste oil,

12  the samples did not constitute hazardous waste in that the concentration of crude/waste oil did not

13  exceed the requisite threshold for hazardous waste.

14          On May 8 and 9, 2001, a preliminary examination was conducted as to Leroy and Kenneth in the

15  criminal action.  Mr. Smith was the prosecutor and called Mr. Buss, among other witnesses, to testify

16  as to his June 7, 2000 observations of the property.  Mr. Buss did not testify as to facts alleged in count

17  three of the criminal complaint (California Penal Code section 182(a)(4) – conspiracy to defraud).  In

18  their declarations, Mr. Smith and Mr. Buss note that at the preliminary hearing, Mr. Buss was merely

19  a witness, did not sit at counsel table, and did not influence Mr. Smith regarding witnesses, evidence,

20  examination or objections.  Mr. Buss limits his involvement to submitting to Mr. Smith Mr. Buss'

21  written report, several photographs, a report from a HAZMAT specialist, and laboratory results.  In his

22  declaration, Mr. Smith states that despite disputes raised by plaintiffs, "I would have prosecuted

23  PLAINTIFFS on the strength of the undisputed, existing evidence, which included photographs, the

24  presence of used oil filters, discarded automotive batteries, waste oil in the soil, the presence of sulfuric

25  acid, the undisputed portions of the written report from [the HAZMAT specialist], and the undisputed

26  portions of the written report from Buss. . . . In sum, I formulated probable cause independent of the

27  disputed evidence."

28          The judicial commissioner presiding over the preliminary hearing stated on the record that there

1  was sufficient cause and evidence to believe that Leroy and Kenneth had violated California Penal Code

2  section 182(a)(1) (conspiracy to commit a crime), Health and Safety Code section 25189.5(b) (disposal

3  of hazardous waste at a facility lacking a permit), Penal Code section 185(a)(4) (defraud by false

4  pretenses), and Penal Code section 185(a)(5) (injurious acts to public health).  Leroy and Kenneth were

5  bound over for trial on all of the criminal complaint's charges.  A Kern County Superior Court judge

6  denied Leroy and Kenneth's appeal of the probable cause determination.  Leroy and Kenneth pursued

7  no further appeal.

8       In the criminal action, Mr. Smith filed a May 22, 2001 information, which incorporated the

9  criminal complaint's allegations.

10       On July 17, 2001, trial commenced in the criminal action against Leroy and Kenneth.  The action

11  as to Ms. Ayala was continued.  Mr. Smith was the prosecutor and called Mr. Buss to testify regarding

12  his June 7, 2000 observations of the Cottonwood property and specifically regarding the presence of

13  sewage and waste.  After three days of trial, Leroy and Kenneth's attorney sought dismissal of the

14  information's four counts.  Mr. Smith voluntarily dismissed counts two (California Health and Safety

15  Code section 25189.5 – disposal, treatment, storage or transportation of hazardous waste without permits

16  or at unauthorized points) and three (California Penal Code section 182(a)(4) – conspiracy to defraud

17  by false pretenses).  Mr. Smith declares that he dismissed count two "in the interest of justice" because

18  it was not "the thrust of the case."  Mr. Smith further declares he did not dismiss count two "because of

19  a lack of evidence" but rather because count two was "secondary to the more pertinent counts."  Mr.

20  Smith notes that he dismissed counts two and three not upon belief that plaintiffs were innocent or there

21  was insufficient evidence to sustain a conviction "but upon my subjective belief that a misdemeanor was

22  an outcome that was unsatisfactory."

23       On July 19, 2001, at the conclusion of the prosecution's case, the trial court granted Leroy and

24  Kenneth's motion for judgment of acquittal as to several counts on grounds of insufficient evidence.

25  The prosecution dismissed remaining charges.  Pursuant to a negotiated settlement, all criminal charges

26  were dismissed against Ms. Ayala on July 27, 2001, prior to a preliminary examination.

27                    **EHS Permit Revocation Proceedings**

28  _____A business which utilizes a "sewer pumping vehicle" or a vehicle to service portable toilets, such

6

as those of plaintiffs, must obtain an EHS health permit for each vehicle.   Under the Kern County Ordinance Code, EHS may suspend or revoke a health permit if EHS finds that a business violated applicable laws or regulations and provides the permittee notice of alleged violations and explaining the permittee's right to request a hearing within 15 days of the notice.

On June 28, 2001, EHS sent a notice to Ms. Ayala to state EHS' intent to revoke ASP's 2001 health and safety registration and to deny reissuance of ASP's health permits for its three sewer pumping vehicles and its toilet service vehicle.   Reasons for the proposed action included allegations that ASP had: (1) used unregistered and/or nonpermitted sewer pumping vehicles; (2) stored sewer pumping vehicles and/or portable toilets on property zoned for residential uses; (3) failed to submit monthly pumping reports to EHS in a "timely, complete, and accurate form"; (4) transferred sewage to holding tanks and other vehicles without notifying EHS; (5) failed to report a sewage spill at the Cottonwood property; (6) pumped "non-permitted wastes . . . such as crude/waste oil" at the Cottonwood property on June 7, 2000; (7) failed to comply with an earlier order to provide certain information about its operations; and (8) failed to complete its 2001 registration.

EHS sent a September 6, 2001 notice to Ms. Ayala to state 12 substantially same allegations with more detail as to time, place and manner of each alleged violation.   After a September 6 and 17, 2001 hearing before an EHS hearing officer, the hearing officer issued his September 20, 2001 decision to sustain the 12 allegations, to revoke ASP's 2001 health and safety registration, and to deny its pending application for 2001-2002 health permits.   More specifically, the hearing officer found that ASP failed to report a sewage spill at the Cottonwood property on June 7, 2000 and pumped non-permitted wastes.

On October 5, 2001, Ms. Ayala filed in Kern County Superior Court a petition for writ of administrative mandate to challenge the EHS hearing officer's decision.   After EHS' successful demurrer, Ms. Ayala filed a first amended petition on February 25, 2002.   The trial court conducted a June 4, 2002 hearing on the first amended petition and issued a September 3, 2002 decision to hold that the hearing officer's 12 factual findings were supported by evidence and the hearing officer's order.   Ms. Ayala appealed to the California Court of Appeal, Fifth District after the superior court's  formal September 30, 2002 order denying Ms. Ayala's writ petition.

The Court of Appeal issued its May 12, 2004 decision to affirm the trial court and observed that

7

"[m]ost of the allegations against ASP concerned either its use of nonpermitted and unregistered vehicles to pump sewage, or its storage, transfer, and/or disposal of sewage at unapproved locations." The Court of Appeal concluded that "the evidence in the administrative record fully supports the trial court's conclusion. [Ms.] Ayala failed to satisfy her burden to demonstrate that EHS's administrative findings were contrary to the great weight of the evidence."

### Kenneth's Conditional Use Permit

On June 12, 2001, the City Board of Zoning Adjustment issued a conditional use permit to Kenneth for the Cottonwood property for operation of septic pumping and portable toilet storage, vehicle towing and impound, and motorized equipment storage. The permit was subject to obtaining a financial assurance bond and a site plan for the Cottonwood property. The City received neither. A July 11, 2001 inspection of the Cottonwood property revealed Kenneth was in violation of the permit and City Municipal Code, and a July 12, 2001 letter advised Kenneth of the violations. After an August 7, 2001 hearing, the City Building Director declared the Cottonwood property a public nuisance and abatement was ordered. The findings were upheld on appeal.

### Plaintiff's Malicious Prosecution Claims

On July 12, 2002, plaintiffs filed their initial complaint to allege civil rights violations to initiate this action. The parties engaged in extensive law and motion to culminate in plaintiffs' operative fifth amended complaint ("complaint"), filed July 14, 2004. The complaint pursues malicious prosecution claims against EHS, Mr. Buss, Mr. O'Rullian and Mr. Gray. Although the complaint's paragraph 6 notes the City is "(not a defendant)," the complaint's caption includes the City as a defendant and the complaint appears to pursue claims against the City.

The complaint alleges that Mr. Buss, Mr. O'Rullian and Mr. Gray "spent substantial time on the plaintiffs' properties, knew of the contents thereon and had personal knowledge that the charges made in the second and third counts of the Criminal Information were untrue." The complaint further alleges defendants conducted no scientific testing to support the presence of hazardous waste on plaintiffs' properties. The complaint alleges the absence of facts to support the criminal complaint's count three (conspiracy to defraud) in that Ms. Kinney and Ms. Honeycutt paid plaintiffs $225 for four hours of driving and work to pump their septic tank on a Sunday although the pumping did not cure their septic

tank blockage.  According to the complaint, Mr. Buss, Mr. O'Rullian and Mr. Gray "were aware that there were no facts to support the second and third causes of action for the criminal information and each participated in the commencement of the criminal prosecution by conspiring together by either directly signing, or encouraging, counseling or inciting the signing of the criminal complaint and by investigating in bad faith."  The complaint claims defendants attempted to overburden plaintiffs with multiple legal proceedings to reflect their "malicious attitude."

As to the City, the complaint alleges the City embarked on a policy, created by Mr. Buss, to cause injury and to enjoin ASP to operate.  As damages, the complaint alleges plaintiffs' legal expenses in connection with the criminal action, injury to personal and business reputations, anxiety, fear and apprehension.

Mr. Buss and the City seek summary judgment/adjudication on grounds that plaintiffs are unable to establish, and evidence negates, elements of plaintiffs' malicious prosecution claims.  Mr. Buss further claims that he is subject to absolute and qualified immunity to bar plaintiffs' malicious prosecution claims.

## DISCUSSION

### Summary Judgment/Adjudication Standards

F.R.Civ.P. 56(b) permits a party against whom a claim is asserted to seek "summary judgment in the party's favor upon all or any part thereof."  Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress*

9

1  & Co., 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464,

2  467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th

3  Cir. 1984).  To carry its burden of production on summary judgment/adjudication, a moving party "must

4  either produce evidence negating an essential element of the nonmoving party's claim or defense or

5  show that the nonmoving party does not have enough evidence of an essential element to carry its

6  ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210

7  F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d

8  563, 574 (9th Cir. 1990).  "[T]o carry its ultimate burden of persuasion on the motion, the moving party

9  must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102;

10  *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts

11  are material.  Only disputes over facts that might affect the outcome of the suit under the governing law

12  will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

13       "If a moving party fails to carry its initial burden of production, the nonmoving party has no

14  obligation to produce anything, even if the nonmoving party would have the ultimate burden of

15  persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *See Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

16  "If, however, a moving party carries its burden of production, the nonmoving party must produce

17  evidence to support its claim or defense."  *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

18  at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

19  fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see*

20  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry

21  of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

22  make the showing sufficient to establish the existence of an element essential to that party's case, and

23  on which that party will bear the burden of proof at trial.  In such a situation, there can be no 'genuine

24  issue as to any material fact,' since a complete failure of proof concerning an essential element of the

25  nonmoving party's case necessarily renders all other facts immaterial.")

26       F.R.Civ.P. 56(e) requires a party opposing summary judgment/adjudication to "set forth specific

27  facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary

28  judgment, if appropriate, shall be entered against the adverse party."  "In the absence of specific facts,

1    as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported

2    summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d

3    1538, 1545 (9th Cir. 1988).  When a summary judgment/adjudication motion is unopposed, a court must

4    "determine whether summary judgment is appropriate – that is, whether the moving party has shown

5    itself to be entitled to judgment as a matter of law." *Anchorage Associates v. V.I. Bd. of Tax Review*,

6    922 F.2d 168, 175 (3rd Cir. 1990).  A court "cannot base the entry of summary judgment on the mere fact

7    that the motion is unopposed, but, rather must consider the merits of the motion." *United States v. One*

8    *Piece of Real Property, etc.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  A court "need not sua sponte review

9    all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion

10   itself is supported by evidentiary materials." *One Piece of Real Property*, 363 F.3d at 1101.

11   Under F.R.Civ.P. 56(c), a summary judgment/adjudication motion, interlocutory in character,

12   may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action,

13   summary judgment may be proper as to some causes of action but not as to others, or as to some issues

14   but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123

15   (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

16   *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).

17   As discussed below, Mr. Buss and the City have met their summary judgment/adjudication

18   burdens to negate elements of plaintiffs' malicious prosecution claims and to demonstrate the absence

19   of genuine issues of material facts and that they are entitled to judgment as a matter of law.

20   **Malicious Prosecution Elements**

21   In the Ninth Circuit, the general rule is that a malicious prosecution claim is not cognizable under

22   section 1983 if process is available in the state judicial system to provide a remedy.  *Usher v. City of Los*

23   *Angeles*, 828 F.2d 556, 561 (9th Cir. 1987); *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (en

24   banc); *Cline v. Brusett*, 661 F.2d 108, 112 (9th Cir. 1981).  Nonetheless, "an exception exists to the

25   general rule when a malicious prosecution is conducted with the intent to deprive a person of equal

26   protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights."

27   *Bretz*, 773 F.2d at 1031; *Cline*, 661 F.2d at 112.

28   A malicious prosecution claim under section 1983 is based on state law elements. *See Usher*,

11

828 F.2d at 562. The essential elements of malicious prosecution are the same in criminal and civil contexts.   The malicious prosecution plaintiff must plead and prove that the prior proceeding, commenced by or at the direction of the malicious prosecution defendant, was: (1) pursued to a legal termination favorable to the plaintiff; (2) brought without probable cause; and (3) initiated with malice. *Villa v. Cole*, 4 Cal.App.4th 1327, 1335, 6 Cal.Rptr.2d 644, 648 (1992).   To prevail, a malicious prosecution plaintiff "must show that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

**Initiation Of Criminal Proceedings**

Mr. Buss argues that as a code enforcement officer, he was not in a position to initiate the criminal action against plaintiffs, the responsibility of which belonged to Mr. Smith.  According to Mr. Buss, he acted only as a code enforcement officer in the June 7, 2000 investigation of the Cottonwood property.  Mr. Buss notes that Mr. Smith decided to prosecute count two (disposal, treatment, storage or transportation of hazardous waste without permits or at unauthorized points) after review of documentation from Mr. Buss and Mr. O'Rullian and including reports, photographs, lab results indicating crude/waste oil on plaintiffs' properties and Mr. Smith's personal observation of plaintiffs' properties.  Mr. Buss points out that as to count three (conspiracy to defraud), Mr. Smith conducted an independent investigation, including interviewing Ms. Kinney and Ms. Honeycutt.  According to Mr. Buss, he  participated in neither Mr. Smith's decision to prosecute plaintiffs nor preparation of the complaint, including charges against plaintiffs.  Mr. Buss further notes he appeared at court proceedings merely as a witness and did not assist Mr. Smith otherwise.

Malicious prosecution actions are not limited to suits against prosecutors and may be pursued against other persons who have wrongfully caused the charges to be filed.  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004); *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-1127 (9th Cir. 2002).   Generally, the decision to file a criminal complaint is presumed to result from an independent determination by the prosecutor and thus precludes liability for those who participated in the investigation or filed a report that resulted in initiation of proceedings.  *Awabdy*, 368 F.3d at 1067; *Smiddy v. Varney*, 665 F.2d 261, 266-268 (9th Cir. 1981), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65

(1982). Nonetheless, the presumption of prosecutorial independence does not bar a subsequent section 1983 claim "against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy*, 368 F.3d at 1067; *see Galbraith*, 307 F.3d at 1126-1127.

The record is clear that Mr. Smith, not Mr. Buss, initiated the criminal action against plaintiffs, although Mr. Buss signed the criminal complaint. There is no dispute that Mr. Buss acted solely as a code enforcement officer and that Mr. Smith, not Mr. Buss, decided whether to file the criminal complaint, whom to charge with crimes, the types of violations to which to prosecute plaintiffs, and whether to charge plaintiffs with felonies or misdemeanors. Mr. Smith, not Mr. Buss, was the prosecutorial force behind the criminal action. As such, there is no genuine issue of material fact whether Mr. Buss commenced or directed the criminal action against plaintiffs.

### Collateral Estoppel – Prosecutorial Deception

Mr. Buss alternatively argues that assuming disputed facts regarding improper pressure on Mr. Smith to prosecute plaintiffs, plaintiffs "are legally foreclosed from asserting the falsity of those contentions under the doctrine of collateral estoppel" in that issues were decided adversely to plaintiffs in the EHS health permit revocation proceedings. Mr. Buss contends that plaintiffs are unable to assert that he "engaged in prosecutorial deception due to the alleged falsity of . . . facts, since pursuant to the doctrine of collateral estoppel, they are considered true."

"Collateral estoppel precludes relitigation of issues argued in prior proceedings." *Lucido v. Superior Court*, 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 769 (1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2021 (1990). Collateral estoppel applies to the section 1983 context in that there is "no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court." *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411 (1980). "A party's ability to relitigate an issue decided in a prior state court determination depends on the law of the state in which the earlier litigation occurred." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105 (10th Cir. 1998).

Threshold requirements to apply collateral estoppel are:

1.   The issue sought to be precluded from relitigation must be **identical** to that decided in

a former proceeding;

2.   The issue must have been **actually litigated** in the former proceeding;

3.   The issue must have been **necessarily decided** in the former proceeding;

4.   The decision in the former proceeding must be **final and on the merits**; and

5.   The party against whom preclusion is sought must be the **same as, or in privity with**,

the party to the former proceeding.

*Lucido*, 51 Cal.3d at 341, 272 Cal.Rptr.2d at 769.

### *Identical Issues*

Mr. Buss points out that the EHS health permit revocation  proceedings against Ms. Ayala and

ASP addressed the following matters as to the Cottonwood property:

1.   Leaking sewage from hose connections on two pumping trucks;

2.   A large vacuum trailer which contained sewage;

3.   Two pumping trucks containing a mixture of sewage and crude/waste oil stored in the

tank;

4.   Discharged contents of a vacuum trailer; and

5.   Approximately 20,000 gallons of sewage or sewage industrial waste mixture on site,

which had not been reported on required monthly pumping reports.

The EHS hearing officer found that Ms. Ayala and ASP failed to report spillage of sewage on June 7,

2000 and pumped non-permitted wastes as non-permitted constituents such as crude/waste oil.  The Kern

County Superior Court and Court of Appeal upheld the EHS findings.

Mr. Buss argues that factual issues of spillage/presence of sewage and crude/waste oil are

"identical" in the EHS health permit revocation proceedings and this action.  "The application of the

doctrine of collateral estoppel depends on whether the *issue* in both actions is the same, not whether the

issue arises in the same *context*."  *First N.B.S. Corp. v. Gabrielsen*, 179 Cal.App.3d 1189, 1195-1196,

225 Cal.Rptr. 254, 257 (1986) (italics in original).

The gist of Mr. Buss' position is that since the EHS health permit revocation was litigated and

upheld, there can be no issue whether Mr. Buss deceived Mr. Smith to pursue charges against plaintiffs.

1  Although there appear to be common issues in the criminal prosecution and the EHS health permit

2  revocation proceedings, Mr. Buss fails to substantiate that the issues are identical.  The hearing before

3  the EHS hearing officer proceeded weeks after the Leroy and Kenneth's trial in the criminal action.

4  Following Mr. Buss' logic, the results of the criminal action could have had collateral estoppel effect

5  in the EHS proceedings, which addressed health permit revocation, not particular criminal activity.  Mr.

6  Buss fails to establish the identity of issues element.

7  ***Actually Litigated And Necessarily Decided Issue***

8  Mr. Buss argues that Ms. Ayala and ASP actually litigated in the EHS health permit revocation

9  proceedings the issues of the sewage spillage and presence of crude/waste oil and were allowed to

10  present evidence before an EHS hearing officer and to challenge EHS findings.  Mr. Buss further notes

11  that Ms. Ayala and ASP pursued the EHS matter to the Kern County Superior Court and Court of

12  Appeal.  Thus, Mr. Buss concludes that the necessary and actual litigation of sewage spillage and

13  presence of crude/waste oil issues "occurred within the context of the administrative hearing and

14  appellate process."

15  Although Ms. Ayala and ASP litigated health permit revocation issues to completion, Mr. Buss

16  fails to demonstrate identity of issues to the criminal action to permit invocation of collateral estoppel.

17  ***Final Decision On Merits***

18  Mr. Buss argues the EHS health permit revocation proceedings through to the Court of Appeal

19  decision addressed the merits of spillage and presence of sewage and crude/waste oil to culminate in a

20  final decision to invoke collateral estoppel.

21  A "'final judgment' includes any prior adjudication of another action that is determined to be

22  *sufficiently firm to be accorded conclusive effect*."  *Sandoval v. Superior Court*, Cal.App.3d 932, 936,

23  190 Cal.Rptr. 29 (1983) (italics in original).  As to administrative decisions, the United States Supreme

24  Court has determined that collateral estoppel applies when "an administrative agency is *acting in a*

25  *judicial capacity* and *resolves disputed issues of fact* properly before it which the parties have had an

26  *adequate opportunity to litigate*."  *United States v. Utah Constr. Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545,

27  1560 (1966) (italics in original).  This Supreme Court standard is "sound" and comports with collateral

28  estoppel's underlying policy to limit litigation by preventing a party who has had a fair trial on an issue

from again drawing it into controversy.  *People v. Sims*, 32 Cal.3d 468, 479, 186 Cal.Rptr. 77, 83 (1982). To determine whether an agency acted "in a judicial capacity," federal courts look to whether the administrative proceedings and determination possessed a "judicial" character."  *Shell Chem. Co., Div. Of Shell Oil Co. v. Teamsters L. U. No. 676*, 353 F.Supp. 480, 485 (D. N.J. 1973); *see also Painters Dist. Coun. No. 38, etc. v. Edgewood Contracting Co.*, 416 F.2d 1081 (5th Cir. 1969); *Groom v. Kawasaki Motors Corp., U.S.A.*, 344 F.Supp. 1000 (W.D. Okla. 1972).

Again, although a final decision on the merits was reached in the EHS permit revocation proceedings, Mr. Buss fails to demonstrate identity of issues with the criminal action.

### Same Party Or Privity

Mr. Buss contends that plaintiffs and ASP had "an identity or community of interest" in the EHS health permit revocation proceedings and "could reasonably have been expected to be estopped by the findings" in the proceedings.

Privity refers to "a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral estoppel."  *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 875, 151 Cal.Rptr. 285 (1978).  The California Supreme Court has explained:

> In the context of collateral estoppel, due process requires that the party to be estopped must have had an identity or community of interest with, an adequate representation by, the losing party in the first action as well as the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.  Thus, in deciding whether to apply collateral estoppel, the court must balance the rights of the party to be estopped against the need for applying collateral estoppel in the particular case, in order to promote judicial economy by minimizing repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial system, or to protect against vexatious litigation.

*Clemmer*, 22 Cal.3d at 875, 151 Cal.Rptr. 285 (citations omitted).

Collateral estoppel has been applied against nonparties who had a proprietary or financial interest in and control of a prior action.  *Lynch v. Glass*, 44 Cal.App.3d 943, 949, 119 Cal.Rptr. 139 (1975). Collateral estoppel further applies when the nonparty has such an interest "in the determination of a question of fact or law with reference to the same subject matter or transaction."  *Stafford v. Russell*, 117 Cal.App.2d 319, 320, 255 P.2d 872 (1953), *cert. denied*, 346 U.S. 926, 74 S.Ct. 315 (1954).

Mr. Buss points out that Ms. Ayala and ASP were parties to the EHS health permit revocation

1    proceedings, that during 1999-2001, Leroy and Kenneth performed septic tank pumping for ASP,  that

2    Kenneth allowed ASP to designate the Cottonwood property as a storage site and allowed storage on the

3    Cottonwood property, and that the City Building Director declared the Cottonwood property a public

4    nuisance and ordered abatement.

5         Mr. Buss points to facts that plaintiffs and ASP are intertwined.  Plaintiffs are related and jointly

6    engaged in septic pumping together.  The evidence suggests that Leroy and Kenneth had no less than

7    a financial interest in the outcome of the EHS health permit revocation proceedings based on the

8    business interest commonality.  For collateral estoppel purposes, plaintiffs and ASP are in no less than

9    privity.  But such privity is of no avail as to Mr. Buss' claim that collateral estoppel applies to

10   prosecution deception issues.

11        Lastly on the issue of prosecutorial deception, Mr. Buss points to Mr. Smith's claim that he

12   would have prosecuted plaintiffs on the strength of undisputed evidence, including photographs,

13   presence of discarded auto batteries and sulfuric acid, sewage spillage, and reports provided to him.  As

14   to the criminal complaint's count three (conspiracy to defraud), Mr. Buss points out he provided no

15   information to Mr. Smith regarding the events giving rise to the charge.

16        The record reveals no genuine issue of material fact that Mr. Buss attempted to deceive Mr.

17   Smith to wrongfully prosecute plaintiffs.  Although collateral estoppel does not apply to prosecutorial

18   deception claims, the record is devoid of support of prosecutorial deception.

19                              **Favorable Termination**

20        Mr. Buss contends that dismissal of the criminal charges against plaintiffs is not favorable

21   termination to support their malicious prosecution claims.

22        In *Jaffe v. Stone*, 18 Cal.2d 146, 149, 114 P.2d 335, 338 (1941), the California Supreme Court

23   addressed the effect of dismissal of criminal charges on a malicious prosecution claim:

24            It is not enough, however, merely to show that the proceeding was dismissed.
         The theory underlying the requirement of favorable termination is that it tends to indicate
25       the innocence of the accused, and coupled with the other elements of lack of probable
         cause and malice, establishes the tort, that is, the malicious and unfounded charge of a
26       crime against an innocent person. . . .  Hence, if the criminal proceeding goes to trial, it
         is ordinarily necessary, as a foundation for a malicious prosecution suit, that the plaintiff
27       have been acquitted. . . .  The same fundamental theory is applied in testing a dismissal
         or other termination without a complete trial on the merits.  If it is of such a nature as to
28       indicate the innocence of the accused, it is a favorable termination sufficient to satisfy

                                        17

the requirement. If, however, the dismissal is on technical grounds, for procedural reasons, or for any other reason not inconsistent with his guilt, it does not constitute favorable termination.

As to matters terminated short of conclusion of trial, the California Court of Appeal has explained:

> Whether or not the termination of an action prior to a determination on the merits tends to indicate innocence on the part of the defendant of the acts with which he is charged must depend on whether the manner of termination reflects on the merits of the matter. In some instances the manner of termination reflects the opinion of the court that the action lacks merit, as where criminal proceedings are dismissed for lack of sufficient evidence of guilt following a preliminary hearing. . . . In others, the termination reflects the opinion of the prosecuting party that, if pursued, the action would result in a decision in favor of the defendant, as where the district attorney seeks dismissal of the prosecution of a criminal action for lack of evidence . . . or where the plaintiff in a civil proceeding voluntarily dismisses the action . . .

*Minasian v. Sapse*, 80 Cal.App.3d 823, 827, 145 Cal.Rptr. 829, 832 (1978).

Mr. Buss points out that at the end of the prosecution's case at Leroy and Kenneth's trial, their defense counsel sought to dismiss the entire action and that after argument, Mr. Smith made a motion to dismiss count two based on what he characterizes as "the interest of justice" and because it was not "the thrust of the case." In his declaration, Mr. Smith notes that he dismissed counts two and three not upon belief that plaintiffs were innocent or there was insufficient evidence to sustain a conviction "but upon my subjective belief that a misdemeanor was an outcome that was unsatisfactory." Mr. Buss contends that the settlement agreement reached with Ms. Ayala was "inconclusive relative to the basis for the dismissal" to reflect "ambiguously on the merits and cannot be said to implicate Ms. Ayala's innocence."

Leroy and Kenneth were not acquitted of the counts at issue here – two and three – in that Mr. Smith dismissed them prior to a jury resolution. Leroy and Kenneth cannot rest on the mere dismissal of the counts in that the dismissals by themselves do not indicate their innocence. The record is bear of evidence that counts two and three were dismissed for reasons even hinting of absence of guilt. There is no tribunal finding that counts two and three lacked merit, especially given the preliminary hearing ruling and Leroy and Kenneth's unsuccessful appeal of it. In his declaration, Mr. Smith indicates he dismissed counts two and three for reasons other than Leroy and Kenneth's innocence. The record and reasonable inferences therefrom indicate the criminal action was not terminated in favor of Leroy and

Kenneth for malicious prosecution purposes.

As to Ms. Ayala, the criminal action did not proceed to trial against her.  The record indicates that she reached a settlement agreement with the prosecution to reflect ambiguity and to leave unresolved her guilt or innocence.  A dismissal resulting from negotiation, settlement or consent is generally not deemed a favorable termination of the proceeding.  *Webb v. Youmans*, 248 Cal.App.2d 851, 853, 57 Cal.Rptr. 11 (1967).  In such a case, the dismissal reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence.  *Minasian*, 80 Cal.App.3d at 827, n. 4, 145 Cal.Rptr. at 832, n. 4.  Similarly ambiguous is the dismissal of criminal proceedings "in the interests of justice," as this term "implies considerations which would favor each side to this litigation." *De La Riva v. Owl Drug Co.*, 253 Cal.App.2d 593, 600, 61 Cal.Rptr 291, 296 (1967).  The record and reasonable inferences therefrom indicate the criminal action was not terminated in favor of Ms. Ayala for malicious prosecution purposes.

## **Probable Cause – Collateral Estoppel**

Mr. Buss argues that under the collateral estoppel doctrine, the probable cause determination at the criminal action's preliminary hearing negates the absence of probable cause element of plaintiffs' malicious prosecution claims.

In the malicious prosecution context, probable cause is a suspicion founded on circumstances sufficiently strong to warrant a reasonable man to believe that the charge is true.  *Centers v. Dollar Markets*, 99 Cal.App.2d 534, 540, 222 P.2d 136, 141 (1950).  To recover compensatory damages, the malicious prosecution plaintiff bears the burden to prove that the defendant did not have reasonable grounds to believe that the facts alleged in the complaint were true.  *Centers*, 99 Cal.App.2d at 540, 222 P.2d at 141.  The California Court of Appeal in *Centers*, 99 Cal.App.2d at 540-541, 222 P.2d at 141, further explained:

> Probable cause does not depend upon the possession of facts which satisfactorily prove the guilt of an accused person.  It has reference to the common standard of human judgment and conduct.  It exists if one is possessed of information or facts which are sufficient to cause a reasonable person to honestly believe the charge is true. . . . Proof of the favorable termination of the criminal proceeding does not create a conflict on the issue of probable cause. . . . Proof that no crime was committed or that the accused is innocent does not negative the existence of probable cause.  (Citations omitted.)

Mr. Buss contends that plaintiffs are collaterally estopped to relitigate probable cause as to counts

1   two and three of the criminal complaint because at a preliminary hearing in the criminal action, a Kern

2   County Superior Court commissioner found probable cause existed to bind plaintiffs over for trial.

3       "The purpose of the preliminary hearing is to weed out groundless or unsupported charges of

4   grave offenses, and to relieve the accused of the degradation and expense of a criminal trial." *Jaffe*, 18

5   Cal.2d at 149, 114 P.2d at 337.  A long-standing principle of California common law is that "a decision

6   by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes *prima facie*

7   – but not *conclusive* – evidence of probable cause."  *Awabdy*, 368 F.3d at 1067 (italics in original).

8   "Among the ways that a plaintiff can rebut a *prima facie* finding of probable cause is by showing that

9   the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other

10  wrongful conduct undertaken in bad faith."  *Awabdy*, 368 F.3d at 1067.

11      As discussed above, the threshold requirements for collateral estoppel are identical issues

12  actually litigated and decided resulting in a final decision on the merits against the same party or party

13  in privity.  *Lucido*, 51 Cal.3d at 341, 272 Cal.Rptr.2d at 769.

14                              *Identical Issues*

15      Mr. Buss contends that the probable cause litigated at the preliminary hearing in the criminal

16  action is identical to the probable cause issue in this action in that the preliminary hearing addressed

17  probable cause for counts two and three of the criminal complaint.

18      "[A] prior judicial determination at a preliminary hearing that there was sufficient evidence to

19  hold the plaintiff over for trial may, in some situations, preclude the plaintiff from relitigating the issue

20  of probable cause to arrest in a subsequent civil suit." *McCutchen v. City of Montclair*, 73 Cal.App.4th

21  1138, 1147, 87 Cal.Rptr.2d 95, 101 (1999); *see Haupt v. Dillard*, 17 F.3d 285, 290 (9th Cir. 1994)

22  ("Because lack of probable cause is an element of a claim of malicious prosecution . . . and because

23  [plaintiff] is collaterally estopped from relitigating that issue, the district court properly granted summary

24  judgment for the defendants.")

25      As to Leroy and Kenneth, there is no apparent distinction in the probable cause issues addressed

26  at the preliminary hearing in the criminal action and here.  Mr. Buss demonstrates sufficient identity of

27  issues to apply collateral estoppel to Leroy and Kenneth's malicious prosecution claims.

28  / / /

                                    20

*Actually Litigated And Necessarily Decided Issue*

Mr. Buss argues that the issue of probable cause was actually and necessarily litigated at the preliminary hearing, the purpose of which was to determine if there was sufficient cause to bind Leroy and Kenneth over for trial.

In *Haupt*, 17 F.3d 285, the malicious prosecution plaintiff argued that because he was acquitted in the underlying criminal trial and because the probable cause determination at his preliminary hearing was not necessary to support that judgment, the issue was not "necessarily decided" as required by state tort (malicious prosecution) law.  The Ninth Circuit disagreed:

> In fact, the probable cause determination *was* necessary to the judgment; the sole purpose of the preliminary hearing was to determine whether [plaintiff] should have been bound over for trial.  But for the probable cause determination, there would have been no trial and no judgment of acquittal.

*Haupt*, 17 F.3d at 289.

As to Leroy and Kenneth, there is no doubt that the probable cause issue was actually and necessarily litigated at the preliminary hearing and that those prongs of collateral estoppel are met as to Leroy and Kenneth.

*Final Decision On Merits*

Mr. Buss argues that the preliminary hearing's probable cause determination became final when the Kern County Superior Court judge denied Leroy and Kenneth's appeal of it and Leroy and Kenneth failed to seek further appeal.

To be a final determination for collateral estoppel purposes, a determination need not be a final judgment but "sufficiently firm to be accorded conclusive effect."  *Luben Industries, Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983). The California Court of Appeal has further explained:

> A finding of probable cause to hold the defendant over for trial is a final judgment on the merits for the purposes of collateral estoppel under the California law because the accused can (1) immediately appeal the determination by filing a motion to set aside the preliminary hearing (Pen. Code, § 995) and (2) obtain review of the decision on the motion to set aside the preliminary hearing by filing a writ of prohibition (Pen. Code, § 999a).  Also, the issue of probable cause cannot be litigated further because it cannot be used as a defense at trial.

*McCutchen*, 73 Cal.App.4th at 1145-1146, 87 Cal.Rptr.2d at 100.

As to Leroy and Kenneth, there can be no doubt that the probable cause issue was finally

1  terminated on the merits with the Kern County Superior Court's denial of Leroy and Kenneth's appeal

2  of the probable cause determination.

3                          ***Same Party Or Privity***

4          Mr. Buss points out that Leroy and Kenneth were parties to the criminal action's preliminary

5  hearing.  Mr. Buss argues that Ms. Ayala was in privity with Leroy and Kenneth in that the facts, overt

6  acts and counts enumerated in the criminal complaint are identical with respect to each of the three

7  plaintiffs.  Mr. Buss further notes that in his closing remarks at the preliminary hearing, counsel for

8  Leroy and Kenneth stated that Ms. Ayala "is already obligated to comply with all the laws in the

9  maintenance of her business."  Mr. Buss attributes defense counsel's comment to suggest that "there

10  were no continuing environmental violations" by Leroy and Kenneth given that Ms. Ayala "was

11  complying with a temporary restraining order in civil court."  Thus, Mr. Buss concludes there was an

12  "inextricable relationship" among plaintiffs such that Ms. Ayala "could have reasonably expected to

13  have been bound by the finding of probable cause at the preliminary hearing in a subsequent 42 U.S.C.

14  § 1983 action."

15          Clearly, Leroy and Kenneth were and are the same parties to the preliminary hearing and this

16  action.  Ms. Ayala was a common defendant with Leroy and Kenneth in counts two and three of the

17  criminal complaint.  The record suggests Ms. Ayala was not a party to the preliminary hearing in that

18  agreement had been reached to continue the criminal action against her.  Nonetheless, Ms. Ayala

19  conducted business with her father (Leroy) and brother (Kenneth) to give rise to a commonality of

20  interest in the probable cause determination in the criminal action.  Based on collateral estoppel effects

21  of the preliminary hearing determination, the absence of probable cause element is negated as to

22  plaintiffs' malicious prosecution claims.

23                              **Malice**

24          Mr. Buss contends that plaintiffs are unable to establish the malice element in that his actions

25  were the result of legitimate code enforcement and investigation.  Mr. Buss points out that he has not

26  issued a citation to any plaintiff despite his ability to do so and that he testified in proceedings against

27  plaintiffs because he was called by prosecutors and not due to ill will or malice toward plaintiffs.

28          Malice means "actuated by a wrongful motive, i.e., the party must have had in mind some evil

                                         22

1   or sinister purpose." *Centers*, 99 Cal.App.2d at 541, 222 P.2d at 141.  Malice is established when "the

2   former suit was commenced in bad faith to vex, annoy or wrong the adverse party."  *Centers*, 99

3   Cal.App.2d at 541, 222 P.2d at 142.  Malice must be proven against a particular defendant to justify an

4   award of compensatory damages against that defendant.  *Centers*, 99 Cal.App.2d 541-542, 222 P.2d at

5   142.  Malice may be proved by direct evidence or may be inferred from all circumstances in the case.

6   *Centers*, 99 Cal.App.2d at 542, 222 P.2d at 142.  Malice may, but need not necessarily, be inferred from

7   want of probable cause.  *Jackson v. Beckham*, 217 Cal.App.2d 264, 273, 31 Cal.Rptr. 739, 745 (1963);

8   *Centers*, 99 Cal.App.2d at 541, 222 P.2d at 142.

9        The record lacks evidence of Mr. Buss' wrongful motive or evil or sinister purpose toward

10  plaintiffs.  There is nothing to suggest that he pursue investigation or signed the criminal complaint in

11  bad faith to vex, annoy or wrong plaintiffs.  Even when construing the evidence and its reasonable

12  inferences most favorably to plaintiffs, a conclusion of malice is not reached.  The record is clear that

13  Mr. Buss' actions at issue arose in connection with his code enforcement responsibilities and nothing

14  more.

15                                    **Absolute Immunity**

16        Mr. Buss contends that he acted in a "quasi-judicial function" to entitle him to absolute

17  prosecutorial immunity insofar as he "was acting under the direction and control of Mr. Smith in signing

18  the complaint."  Mr. Buss points out that he signed the criminal complaint "upon information and belief"

19  and at the "direction and control" of the Kern County District Attorney's office.  Mr. Buss argues that

20  in connection with the criminal complaint, he did not serve as a witness and personally verify its alleged

21  facts and thus is not a complaining witness entitled to lesser qualified immunity.

22        State prosecutors are entitled to absolute prosecutorial immunity for acts taken in their official

23  capacity.  *See Imbler v. Pachtman*, 424 U.S. 409, 427, 430-431; 96 S.Ct 984 (1976).  In *Schlegel v.*

24  *Bebout*, 841 F.2d 937, 943-944 (9th Cir. 1988), the Ninth Circuit Court of Appeals provided guidance

25  to determine the scope of prosecutorial immunity:

26           Our inquiry must center on the nature of the official conduct challenged, and not
           the status or title of the officer.  As a result, we must examine the particular prosecutorial

27           conduct of which [plaintiff] complains.  If we determine that the conduct is within the
           scope of [defendants'] authority and is quasi-judicial in nature, our inquiry ceases since

28           the conduct would fall within the sphere of absolute immunity.

To determine whether conduct of a state official is within his or her authority, the proper test is not whether the act performed was manifestly or palpably beyond his or her authority, but rather whether it is more or less connected with the general matters *committed* to his or her control or supervision. . . .

Absolute immunity depends on the function the officials are performing when taking the actions that provoked the lawsuit.  We must look to the nature of the activity and determine whether it is "intimately associated with the judicial phase of the criminal process." . . . Investigative or administrative functions carried out pursuant to the preparation of a prosecutor's case are also accorded absolute immunity.  (Emphasis in original; citations omitted.)

Determining whether a prosecutor or officer's actions are immunized requires a functional analysis.  The classification of the challenged acts, not the motivation underlying them, determines whether absolute immunity applies. *See Ashelman v. Pope*, 793 F.2d 1072, 1075 (9th Cir. 1986)(en banc).

Prosecutors and other eligible government personnel are absolutely immune from section 1983 damages in connection with challenged activities related to the initiation and presentation of criminal prosecutions.  *Imbler*, 424 U.S. 409; *see also Kalina v. Fletcher*, 118 S.Ct. 502, 507, 118 S.Ct. 502 (1997); *Roe v. City of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997).  "[A]bsolute prosecutorial immunity attaches to the actions of a prosecutor if those actions were performed as part of the prosecutor's preparation of his case, even if they can be characterized as 'investigative' or 'administrative.'" *Demery v. Kupperman*, 735 F.2d 1139, 1143 (9th Cir. 1984), *cert. denied*, 469 U.S. 1127, 105 S.Ct. 810 (1985).  Absolute prosecutorial immunity attaches to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution.  *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir.), *cert. denied*, 522 U.S. 996, 118 S.Ct. 650 (1997).[3]  Even charges of malicious prosecution, falsification of evidence, coercion of perjured testimony and concealment of exculpatory evidence will be dismissed on grounds of prosecutorial immunity.  *See Stevens v. Rifkin*, 608 F.Supp. 710, 728 (N.D. Cal. 1984).  Further activities intimately connected with the judicial phase of the criminal process include making statements that are alleged misrepresentations and mischaracterizations during hearings and discovery and in court papers, *see Fry v. Melaragno*, 939 F.2d 832, 837-838 (9th Cir. 1991), and conferring with witnesses and allegedly inducing them to testify falsely, *see Demery*, 735 F.2d at

---

[3]      Not all investigative acts of a prosecutor are absolutely protected.  A preliminary investigation is generally removed from a prosecutor's role in a judicial proceeding in that "such investigations take place outside the adversarial arena with it attendant safeguards that provide real and immediate checks to abusive practices." *Auriemma v. Montgomery*, 860 F.2d 273, 278 (7th Cir. 1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215 (1989).

1144.

Actions for which there is absolute immunity include preparation and filing an information and a motion for an arrest warrant, *Ceballos v. Garcetti*, 361 F.3d 1168, 1184 (9th Cir. 2004); *Kalina v. Fletcher*, 522 U.S. 118, 129, 118 S.Ct. 502 (1997), initiating a prosecution, *Imbler*, 424 U.S. at 430, 96 S.Ct. 984, and withholding evidence during trial, *Imbler*, 424 U.S. at 431-423, n. 34, 96 S.Ct. 984. Actions that are not directly related to the judicial process do not give rise to absolute immunity, even if they occur after a prosecution is initiated. *Ceballos*, 361 F.3d at 1184.

In addressing elements of plaintiffs' malicious prosecution claims, Mr. Buss disavows that he took action to initiate the criminal prosecution against plaintiffs other than to sign the criminal complaint at Mr. Smith's direction. According to Mr. Smith's declaration, Mr. Smith unilaterally filed the criminal action against plaintiffs and decided how to proceed against plaintiffs independent of Mr. Buss. Mr. Buss and Mr. Smith suggest in there declarations that Mr. Smith was not intimately associated with the judicial phase of the criminal process and was merely a witness. As such, Mr. Buss' evidence negates his absolute prosecutorial immunity defense, which is better suited for Mr. Smith.

## Qualified Immunity

Mr. Buss argues alternatively that if his conduct is considered as that of a complainant or witness, he is entitled to qualified immunity.

A prosecutor is not entitled to absolute prosecutorial immunity for swearing to facts in support of documents such as a bail revocation motion. *See Cruz v. Kauai County*, 279 F.3d 1064, 1067 (9th Cir.), *cert. denied*, 537 U.S. 1053, 123 S.Ct. 608 (2002). A prosecutor loses such protection when he/she steps outside the prosecutorial role and into a witness role to attest to the truth of facts in an affidavit. *Cruz*, 279 F.3d at 1067; *see Kalina*, 522 U.S. at 130,118 S.Ct. 502 ("Testifying about facts is the function of the witness, not of the lawyer."); *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) ("Filing a crime report as a complaining witness or a crime victim is analogous to filing an affidavit or oath in support of an arrest warrant.")

When a prosecutor or other official switches from presenting the charging document to vouching personally for the truth of the document's contents, "the protection afforded by absolute immunity must give way to a qualified immunity inquiry." *Ireland v. Tunis*, 113 F.3d at 1447. Qualified immunity

protects section 1983 defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004). The "heart of qualified immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the case. Instead, the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be is true, any allegedly violated right was clearly established." *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir. 1995).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Courts stress "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534 (1991).

The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991). As to summary judgment on qualified immunity, the Ninth Circuit Court of Appeals has explained:

> Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first step in the qualified immunity analysis is "to consider the materials submitted in support of, and in opposition to, summary judgment in order to decide **whether a constitutional right would be violated** if all facts are viewed in favor of the party opposing summary judgment." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001). "If no constitutional violation is shown, the inquiry ends." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). On the other hand, if "the parties' submissions" create a triable issue of whether a constitutional violation occurred, the second question is "**whether the right was clearly established**." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. A constitutional right is clearly established when "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

*Squaw Valley*, 375 F.3d at 943 (Bold added).

The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987). "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the

1    immunity defense." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

2         Qualified immunity "turn[s] primarily on objective factors": "Reliance on the objective

3    reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid

4    excessive disruption of government and permit the resolution of many insubstantial claims on summary

5    judgment." *Harlow v. Fitzgerald*, 457 U.S. 808, 818, 102 S.Ct. 2727 (1982).

6         In their complaint, plaintiffs allege the criminal action "constituted a violation of plaintiffs' rights

7    under the Fourth Amendment of the United States Constitution in that the prosecution was undertaken

8    and the warrants were issued without probable cause to believe that [plaintiffs] . . . had violated the laws

9    with which they were accused . . . in the second and third counts of the criminal information . . ." In the

10   absence of opposition papers, plaintiffs offer nothing further to shape the contours of alleged

11   constitutional violation.

12        Mr. Buss argues that he reasonably and in good faith believed probable cause existed to prosecute

13   plaintiff for count two of the criminal complaint (California Health and Safety Code section 25189.5 –

14   disposal, treatment, storage or transportation of hazardous waste without permits or at unauthorized

15   points). Mr. Buss reiterates that on June 7, 2000, he observed at the Cottonwood property discarded

16   automotive batteries and motor oil buckets, two polyurethane barrels and two five-gallon barrels of

17   sulfuric acid, sewage spillage, and 9,000 gallons of sewage in tanks with attached hoses potentially

18   causing spillage. To conclude the presence of hazardous waste at the Cottonwood property, Mr. Buss

19   notes that he relied on his personal observations, a report of a HAZMAT specialist, and laboratory

20   results. Mr. Buss argues that he reasonably believed plaintiffs engaged in unlawful disposition of

21   hazardous waste at the Cottonwood property in that: (1) Ms. Ayala owned ASP; (2) Leroy and Kenneth

22   worked for ASP; (3) Kenneth owned the Cottonwood property; (4) a vacuum trailer on the Cottonwood

23   property was registered to Kenneth and contained sewage; (5) the Cottonwood property was a designated

24   storage site for ASP; and (6) four ASP trucks were located on the Cottonwood property on June 7, 2000.

25   Mr. Buss further notes that he could not have known that the crude/waste oil was not hazardous waste

26   until the April 26, 2001 laboratory results which arose 14 days after he signed the criminal complaint

27   and months after the initial June 7, 2000 investigation of the Cottonwood property.

28        Plaintiffs claim their constitutional rights were violated in that they were prosecuted as to count

27

two without probable cause.  As noted above in the discussion regarding collateral estoppel, the probable cause issue is resolved in favor of Mr. Buss as to count two.  Based on the record, there is insufficient showing of, or a factual question as to, violation of a constitutional right in that probable cause supported pursuit of count two.  Just as important, the record lacks facts that Mr. Buss' actions violated plaintiffs' constitutional rights relative to probable cause to pursue count two.  As such, the inquiry ends, and the issue of clearly established right need not be addressed.

As to count three (conspiracy to defraud) of the criminal complaint, Mr. Buss attributes plaintiffs as alleging that Mr. Buss filed the criminal complaint without first investigating the truth.  Mr. Buss argues that plaintiffs lack proof that Mr. Buss had knowledge that facts relative to count three were false.  Mr. Buss contends that based on existing law at the time, he held an objectively reasonable belief that he lawfully signed the criminal complaint with its count three and that plaintiffs' alleged violated rights were not clearly established.

Mr. Buss relies on *Cruz*, 279 F.3d 1064, where an arrestee pursued section 1983 claims against a county prosecutor and alleged the prosecutor included false statements in an affidavit for bail revocation.  As to qualified immunity's  first step of whether a constitutional right was violated, the Ninth Circuit applied the usual rule that "a complaint that an officer knowing filed a false affidavit to secure an arrest warrant states a claim under § 1983." *Cruz*, 279 F.3d at 1068.  Turning to whether such right was "clearly established" under the circumstances at issue in *Cruz*, the Ninth Circuit found it was not:

> The right violated here, according to the complaint and evidence favorable to [plaintiff], was the Fourth Amendment right not to have a prosecutor, in order to obtain a bail revocation, personally attest to a false statement of a biased source with no investigation of the statement's truth or falsity.  Unfortunately for [plaintiff], he has not cited any case that establishes such a right, nor is it self-evident.  The situation is not one that appears to have addressed, even tangentially, in the case law.  It would not be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 121 S.Ct. at 2156.

*Cruz*, 279 F.3d at 1069.

Plaintiffs claim their constitutional rights were violated in that they were prosecuted as to count three without probable cause.  The record reveals that Mr. Buss was not involved in the investigation regard count three which addressed the 2001 septic pumping job for Ms. Kinney and Ms. Honeycutt.

28

1    There is no evidence that Mr. Buss had knowledge of facts relative to count three.  Plaintiffs apparently

2    claim that Mr. Buss was obliged to investigate the facts as to count three prior to signing the criminal

3    complaint.  As noted in *Cruz*, such a right is not clearly established.  Accordingly, Mr. Buss is entitled

4    to qualified immunity as to count three as well as count two.

5                                                **Advice Of Counsel**

6            Mr. Buss relies further on advice of counsel as a defense to plaintiffs' malicious prosecution

7    claims.  Mr. Buss notes that he relied on Mr. Smith and the Kern County District Attorney's office as

8    to: (1) whether to file the criminal complaint; (2) whom to charge; (3) violations to prosecute; and (4)

9    whether to charge plaintiffs with misdemeanors or felonies.

10           Advice of counsel is a recognized defense to malicious prosecution if there is a showing of "full

11   disclosure of all relevant facts and that a person acting on the advice of counsel indicates that he has

12   proceeded with probable cause and in good faith."  *Bertero v. National General Corp.*, 13 Cal.3d 43,

13   53, 118 Cal.Rptr. 184, 192 (1974).  The burden of proof is on the party asserting the advice of counsel

14   affirmative defense.  *Bertero*, 13 Cal.3d at 54, 118 Cal.Rptr. at 192.  Advice of counsel must be sought

15   "in good faith," not "as a mere cloak to protect one against a suit for malicious prosecution."  *Bertero*,

16   13 Cal.3d at 54, 118 Cal.Rptr. at 192; *Walker v. Jensen*, 95 Cal.App.2d 269, 274, 212 P.2d 569, 572

17   (1949).  A malicious prosecution defendant "may not plead advice of counsel as a defense where he

18   failed to make a full and fair disclosure of all the pertinent facts which he knew or should have known

19   with regard to the alleged malicious charge."  *Jackson*, 217 Cal.App.2d at 272, 31 Cal.Rptr. at 744.

20           The advice of counsel defense appears as an odd choice in that Mr. Buss was not a party to

21   criminal action and did not directly sue plaintiffs "under advice of counsel."  The facts upon which Mr.

22   Buss relies to support the advice of counsel defense better support Mr. Buss' absence of initiation of the

23   criminal action and qualified immunity defense.  Mr. Buss has failed to present sufficient evidence to

24   invoke the advice of counsel defense under these circumstances.

25                                              ***Monell* Liability**

26           Although paragraph 6 of plaintiffs' complaint indicates that the City is not a defendant, plaintiffs'

27   complaint alleges that the City embarked on a policy, created by Mr. Buss, to cause injury and to enjoin

28   ASP to operate.  The City seeks summary judgment and appears to assume that it is a defendant.

1    According to the City, plaintiffs' interrogatory responses suggest they pursue claims against the

2    City based on respondeat superior liability for Mr. Buss's actions.  The City argues that plaintiffs rely

3    on conclusory allegations and have asserted no facts for *Monell* liability based on a custom, practice or

4    policy regarding code enforcement investigations, submitting false information to the Kern County

5    District Attorney's office, and signing complaints against septic tank pumpers.

6    A local government unit may not be held liable for the acts of its employees under a respondeat

7    superior theory.  *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978);

8    *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 275 (1991);

9    *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989).  Because liability of a local

10   governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go beyond

11   the respondeat superior theory and demonstrate the alleged constitutional violation was the product of

12   a policy or custom of the local governmental unit.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385,

13   109 S.Ct. 1197 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-480, 106 S.Ct. 1292 (1986).

14   To maintain a section 1983 claim against a local government, a plaintiff must establish the requisite

15   culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the

16   policy or custom as the "moving force" behind the constitutional deprivation).  *Monell*, 436 U.S. at 691-

17   694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

18   A plaintiff can establish a "policy or custom" by showing: (1) an express policy that, when

19   enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by

20   written law or express municipal policy, is so permanent and well settled as to constitute a custom or

21   usage with force of law; or (3) an allegation that the constitutional injury was caused by a person with

22   final policymaking authority.  *Gable*, 296 F.3d at 537; *Baxter v. Vigo County School Corp.*, 26 F.3d 728,

23   735 (7th Cir. 1994).

24   "The existence of a policy, without more, is insufficient to trigger local government liability

25   under section 1983."  *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  "Only if a plaintiff shows

26   that his injury resulted from a 'permanent and well-settled' practice may liability attach for injury

27   resulting from a local government custom."  *Thompson*, 885 F.2d at 1444.  "[O]fficial policy must be

28   'the moving force of the constitutional violation' in order to establish the liability of a government body

1    under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445 (1981) (quoting *Monell*, 436

2    U.S. at 694, 98 S.Ct. 2018)); *see Rizzo v. Goode*, 423 U.S. 362, 370-377, 96 S.Ct. 598 (1976) (general

3    allegation of administrative negligence fails to state a constitutional claim cognizable under section

4    1983).   A "plaintiff must show that the municipal action was taken with the requisite degree of

5    culpability and must demonstrate a direct causal link between the municipal action and the deprivation

6    of federal rights." *Bryan County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382 (1997).

7    A plaintiff must demonstrate that a defendant's policy was "closely related to the ultimate injury."

8    *Harris*, 489 U.S. at 391, 109 S.Ct. at 1206.  "At the very least there must be an affirmative link between

9    the policy and particular constitutional violation." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct.

10   2427 (1985).

11           Section 1983 causation is "not to be gauged by the standards of ordinary tort law." *Gonzalez v.*

12   *Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 755 (5th Cir. 1993) (citing *Martinez v. California*, 444 U.S. 277,

13   285, 100 S.Ct. 553, 559 (1980)).  The "requirement of a causal connection in a § 1983 action often may

14   have the practical effect of imposing a heightened standard of proximate cause. *Doe v. Rains County*

15   *Indep. Sch. Dist.*, 66 F.3d 1402, 1415 (5th Cir. 1995).  "Although a section 1983 claim has been

16   described as a 'species of tort liability,' it is perfectly clear that not every injury in which a state official

17   has played some part is actionable under that statute." *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559

18   (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988 (1976)).

19           "Proof of a singe incident of unconstitutional activity is not sufficient to impose liability under

20   *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional

21   municipal policy, which policy can be attributed to a municipal policymaker.  Otherwise the existence

22   of the unconstitutional policy, and its origin, must be separately proved." *Tuttle*, 471 U.S. at 823-824,

23   105 S.Ct. at 2436.

24           The City argues that the record reveals nothing to suggest a causal relationship between a City

25   custom, policy or practice and plaintiffs' alleged injuries.  More specifically, the City argues that Mr.

26   Buss' actions at issue (investigation, submission of information to Mr. Smith, and signing the criminal

27   complaint) were not pursuant to a custom and practice to maliciously prosecute septic tank pumpers.

28           The City is correct.  The record is devoid of evidence of an alleged constitutional violation

31

1  arising from a City policy or custom.

2     The City further contends that Mr. Buss, as a City code enforcement officer, was not a

3  policymaker to permit invocation of *Monell* liability.

4     A "rule or regulation promulgated, adopted, or ratified by a local governmental entity's

5  legislative body unquestionably satisfies *Monell*'s policy requirements." *Thompson*, 885 F.2d at 1443.

6  Official policy may derive from "a decision properly made by a local governmental entity's authorized

7  decisionmaker – i.e., an official who 'possesses final authority to establish [local government] policy

8  with respect to the [challenged] action.'" *Thompson*, 885 F.2d at 1443 (quoting *Pembaur*, 475 U.S. at

9  481, 106 S.Ct. at 1299 (plurality opinion)).  To the extent that "policy" and "custom" imply something

10  beyond a single decision, official liability may be imposed "where a first-time decision to adopt a

11  particular course of action is directed by a governmentally authorized decisionmaker." *Larez v. City of

12  Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

13     There is an absence of evidence that Mr. Buss, a code enforcement officer, is an authorized

14  decisionmaker to invoke *Monell* liability.

15                    **CONCLUSION AND ORDER**

16     For the reasons discussed above, this Court:

17  1.     GRANTS the City and Mr. Buss summary judgment; and

18  2.     DIRECTS this Court's clerk to enter judgment in favor of defendants City of Bakersfield

19          and Terry Buss and against plaintiffs Leroy Edwards, Kenneth Edwards and Roxanne

20          Ayala on grounds there is no just reason to delay entry of judgment.  F.R.Civ.P. 54(b).

21     IT IS SO ORDERED.

22  **Dated:   January 10, 2006**          _____**/s/ Lawrence J. O'Neill**_____
    66h44d                                 UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

32