1
2
3
4
5
6
7
8                        **IN THE UNITED STATES DISTRICT COURT**

9                     **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ROXANNE AYALA, et al.,                        CASE NO. CV F 02-5846 LJO

12                        Plaintiffs,              **SUMMARY JUDGMENT DECISION**
                  vs.                               (Doc. 135.)
13
      KC ENVIRONMENTAL HEALTH, et al.,
14
                        Defendants.
15    _____/

16                              **INTRODUCTION**[1]

17         In this malicious prosecution action under 42 U.S.C. § 1983 ("section 1983"), defendants Kern

18    County Environmental Health Services Department ("EHS"), EHS environmental specialist William

19    O'Rullian ("Mr. O'Rullian"), and EHS environmental health technician Terry Gray ("Mr. Gray")[2] seek

20    summary judgment on grounds that evidence negates the claims of plaintiffs Leroy Edwards, Kenneth

21    Edwards and Roxanne Ayala[3] (collectively "plaintiffs") and that Mr. O'Rullian and Mr. Gray are entitled

22    to qualified immunity.  This Court considered the County defendants' summary judgment motion on the

23    _____

24         [1]      Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties consented to proceed before a United States
      Magistrate Judge, and by a September 27, 2004 order, this action was assigned to United States Magistrate Judge Lawrence
25    J. O'Neill for all further proceedings.

26         [2]      EHS, Mr. O'Rullian and Mr. Gray will be referred to collectively as the "County defendants."

27         [3]      Roxanne Ayala ("Ms. Ayala") was Roxanne Edwards' married name.  Currently, Ms. Ayala is known as
      Ms. Edwards.  For convenience, this Court will refer to her as Ms. Ayala in that she used that name at times relevant to
28    plaintiffs' claims.

                                            1

record[4] and without oral argument, pursuant to this Court's Local Rule 78-230(h).  For the reasons discussed below, this Court GRANTS the Kern County defendants summary judgment.

## BACKGROUND

### The Parties

_____Plaintiff Leroy Edwards ("Leroy") is the father of plaintiff Kenneth Edwards ("Kenneth") and Ms. Ayala.  At times relevant, Ms. Ayala was the sole owner of Action Sewer Pumping ("Action"), a septic pumping business.  According to plaintiffs, Ms. Ayala was "responsible for operating" Action.  Action's sewer pumping trucks pumped contents of residential and commercial septic tanks into containers on the trucks and transported the contents to a disposal site.  Action also rented and maintained portable chemical toilets.  During 1997-2000, Ms. Ayala dba Action held EHS health and safety permits ("health permits") to operate a septic pumping business and toilet rental agency in Kern County.

During 1999-2001, Leroy and Kenneth performed services for Action, including driving its trucks, and were paid for their work.  The County defendants contend that although Ms. Ayala claimed to own Action, it was a family business partnership among plaintiffs and Diane Temple ("Ms. Temple"), Kenneth's wife, in that profits were split among plaintiffs and Ms. Temple, who also worked for Action.  In his deposition, Kenneth noted that Action monies were split among Ms. Ayala, Ms. Temple and Kenneth.  In her deposition, Ms. Ayala admitted to a splitting of Action monies.  Plaintiffs note that Action "was a family business" with Leroy as "the patriarch" who "participated when it was convenient."  In her declaration, Ms. Ayala states that she "left the physical operation of the daily business to my family members."

EHS operates a septic pumping program to assure septage and sewage are safely removed, transported and disposed of in compliance with state and Kern County regulations.  EHS also issues health permits to septic pumping providers.  Kern County employs Mr. O'Rullian as an environmental

---

[4] This Court carefully reviewed and considered all argument, points and authorities, declarations, depositions, exhibits, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.  Omission of reference to an argument, document, paper or objection is not to be construed to the effect that this Court did not consider the argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it deemed admissible, material and appropriate for summary judgment.

1    specialist in EHS.  Since 1989, Mr. O'Rullian has supervised the EHS solid waste and vector control

2    program but, according to the County defendants, is neither an EHS manager nor policy maker.

3       During 1994-2004, Kern County employed Mr. Gray as an environmental health technician in

4    the EHS solid waste and vector program.  Mr. O'Rullian supervised Mr. Gray, whose duties included

5    investigations into compliance with EHS health permits, field observations, and joining inspections of

6    other agencies and communicating with other agencies.

7       Defendant City of Bakersfield ("City") employed defendant Terry Buss ("Mr. Buss") as a code

8    enforcement officer to enforce the City municipal code and the California Health & Safety Code and

9    Code of Regulations and to investigate related wrongdoing.  This Court issued its January 10, 2006

10   decision to grant the City and Mr. Buss (collectively the "City defendants") summary judgment on nearly

11   identical grounds as the County defendants' present motion.  Plaintiffs appeal the summary judgment

12   and this Court's denial of relief as to plaintiffs' failure to file timely opposition papers to the City

13   defendants' summary judgment motion.

14                        **Property Inspections**

15       Kenneth owns nearly 20 acres of vacant land on Cottonwood Road ("Cottonwood property")in

16   a heavy industrial zoned area of Bakersfield.  In 2000, the Cottonwood property was Action's designated

17   storage yard for vehicles and equipment.  Action paid Kenneth for use of the Cottonwood property.

18       Leroy has leased and used property on South Union Avenue in Bakersfield ("Union property")

19   to store equipment, machinery and vehicles subject to a pre-existing use exception to the area's current

20   zoning.  Leroy lived in Bakersfield at 340 Hudson Drive ("Hudson property"), which was owned by Ms.

21   Ayala, who paid Leroy's rent from Action's account in return for Leroy's services for Action.  Plaintiffs

22   note that Ms. Ayala permitted Leroy to live at the Hudson property and to "pay as he would."

23       Kenneth and Ms. Temple lived in Bakersfield at 2311 South Eye Street ("Eye Property").

24       The County defendants note that in spring 2000, EHS began to investigate Action because

25   "regular review" of Action's pumping records revealed omissions, discrepancies and anomalies as to,

26   among other things, septic pumping reports for sewer system locations.  On June 7, 2000 and pursuant

27   to an inspection warrant sought by the City to address municipal code compliance issues, a multi-agency

28   inspection was conducted of the Cottonwood property.  Mr. O'Rullian assigned Roger Berretti ("Mr.

Berretti") of the EHS solid waste and vector control program to observe and take photographs during the inspection in that the Cottonwood property was Action's designated storage area for septic pumping and toilet rental vehicles and equipment.  For EHS, the inspection  addressed health permit violations.  Mr. O'Rullian and Mr. Gray neither participated in the June 7, 2000 inspection of the Cottonwood property nor prepared a report regarding the inspection.  Mr. Berretti prepared the EHS inspection report.

Mr. O'Rullian and Mr. Gray participated in June 7, 2000 inspections, pursuant to warrants, of the Union, Hudson and Eye properties to address violations of health permits and environmental laws and regulations.  On the Union property, Mr. O'Rullian and Mr. Gray observed used vehicle batteries, used oil filters, spilled waste oil and chemical and oil drums.  On the Hudson property, Mr. O'Rullian and Mr. Gray observed what they believed to be stained or oily soil to suggest release of used oil, hydraulic fluid and other wastes, containers of waste oil and hydraulic fluid, approximately 50 waste vehicle batteries, and used oil filters.  Mr. O'Rullian and Mr. Gray note that at the Eye property, they observed health permit violations but no hazardous waste.  Mr. O'Rullian prepared EHS reports for the Union, Hudson and Eye properties to note violations of the Kern County Ordinance Code and California Health & Safety Code and Code of Regulations.  In his reports, Mr. O'Rullian did not note violation of California Health & Safety Code section 25189.5 (disposal, treatment, storage or transportation of hazardous waste without permits or at unauthorized points).  Mr. Gray did not prepare reports of inspections of the Union, Hudson and Eye properties.

### Civil Proceedings Against Plaintiffs And Re-Inspections Of The Properties

On August 14, 2000, EHS issued its notice and order to require Action to remove all sewage in tanks at the Cottonwood, Union, Hudson and Eye properties (collectively "plaintiffs' properties") to a proper disposal site and to provide, no later than August 31, 2000, documentation of the registered sewage pumping services used to remove the sewage and of proper disposal of the sewage.

During the summer or early fall 2000, Craig A. Smith ("Mr. Smith"), a Kern County Deputy District Attorney, reviewed reports, laboratory results and photographs relating to inspections of plaintiffs' properties.  Mr. Smith is responsible  to enforce civil and criminal environmental laws, including housing and business conditions.  Mr. Smith was assigned to prosecute a civil action against plaintiffs to address, in part, Action's business practices.  On October 12, 2000, a Kern County Superior

Court civil action ("civil action") was filed against plaintiffs to seek, among other things, injunctive and nuisance relief and civil penalties regarding alleged hazardous use of plaintiffs' properties.

Mr. O'Rullian and Mr. Gray were aware of the civil action since it involved Action.   In November 2000, Mr. O'Rullian and Mr. Gray participated in re-inspections of plaintiffs' properties, pursuant to an order of the court in the civil action.   Mr. O'Rullian wrote EHS reports on the re-inspections and did not note violation of California Health & Safety Code section 25189.5 (disposal, treatment, storage or transportation of hazardous waste without permits or at unauthorized points).

**Pumping Job Complaint**

In early 2001, Mr. O'Rullian received a telephone call from one of two elderly sisters Shirley Kinney ("Ms. Kinney") or Irma Honeycutt ("Ms. Honeycutt") who complained about American Pumping, Kenneth's non-septic pumping business, and that Leroy and Kenneth failed to pump Ms. Kinney and Ms. Honeycutt's septic tank although Leroy and Kenneth indicated they had pumped and were paid for pumping.   Leroy and Kenneth claim they drove 45 minutes each way to Ms. Kinney and Ms. Honeycutt's mobile home, dug down four feet to uncover the septic tank lid, and pumped their septic tank for 25-45 minutes without success in that the septic tank had been abused and not cleaned out for 18 years and the line to the septic tank was blocked.

Mr. O'Rullian notes that he was concerned because he knew that American Pumping did not have a Kern County septic pumping license.   Mr. O'Rullian referred the Ms. Kinney/Ms. Honeycutt complaint to Mr. Smith as it appeared to relate to business practices, not an environmental health matter. Mr. O'Rullian informed Mr. Smith of the Ms. Kinney/Ms. Honeycutt complaint and that they would contact Mr. Smith.

Mr. Smith interviewed Ms. Kinney and Ms. Honeycutt at their mobile home and was told their septic tank had not been pumped and remained full.   Mr. O'Rullian notes that after he learned that Mr. Smith had interviewed Ms. Kinney and Ms. Honeycutt, Mr. O'Rullian did not discuss with Mr. Smith or anyone else from his office the validity of Ms. Kinney and Ms. Honeycutt's claims or whether plaintiffs should be prosecuted.   Mr. Gray had neither involvement in Ms. Kinney and Ms. Honeycutt's complaint nor contact with Ms. Kinney, Ms. Honeycutt or the District Attorney's Office regarding their complaint.

1

### Criminal Action Against Plaintiffs

2

### *The Charges Against Plaintiffs*

3       On April 12, 2001, Mr. Smith caused to be filed a four-count criminal complaint ("criminal

4   complaint") to initiate a Kern County Superior Court action ("criminal action") against plaintiffs.  Count

5   one alleged plaintiffs unlawfully conspired to violate several California Health and Safety Code and

6   Penal Code sections (misdemeanors and felonies) addressing transport and disposal of hazardous waste

7   and fraudulent receipt of money for services.  Count two alleged plaintiffs committed a felony by

8   violating California Health and Safety Code section 25189.5 (disposal, storage or transportation of

9   hazardous waste without permits or at unauthorized points).[5]  Count three alleged plaintiffs committed

10  a felony by violating California Penal Code section 182(a)(4) by conspiring unlawfully to defraud Ms.

11  Kinney and Ms. Honeycutt and to obtain money by false pretenses in connection with the January 21,

12  2001 septic pumping job.[6]  Count four alleged plaintiffs committed a felony by violating California

13  Penal Code section 182(a)(5) and unlawfully conspired to commit acts injurious to public health.  Mr.

14  Buss signed and verified the criminal complaint.

15      In his declaration, Mr. Smith states that he "initiated the prosecution" of the criminal action

16  against plaintiffs and "made the decision that probable cause existed to prosecute" plaintiffs in the

17  criminal action "independent" of Mr. O'Rullian and Mr. Gray.  Mr. Smith declares that he "solely"

18  decided to prosecute plaintiffs on count two after he reviewed documentation from Mr. O'Rullian and

19  Mr. Buss and including written reports, photographs, interviews, and laboratory results indicating the

20  presence of crude/waste on plaintiffs' properties.  Mr. Smith notes that he visited plaintiffs' properties

21  and observed them.

22      Mr. Smith further declares that he conducted "an independent investigation" regarding count

23  ────────────────

24      [5]      Hereinafter, "count two" will refer to the criminal complaint's count two to charge that plaintiffs committed

25  a felony by violating California Health and Safety Code section 25189.5 (disposal, storage or transportation of hazardous
    waste without permits or at unauthorized points).

26      [6]      Hereinafter, "count three" will refer to the criminal complaint's count three to charge that plaintiffs

27  committed a felony by violating California Penal Code section 182(a)(4) (unlawful conspiracy to defraud and to obtain money
    by false pretenses).

28          Counts two and three are the subjects of plaintiffs' malicious prosecution claims.

three and interviewed Ms. Kinney and Ms. Honeycutt.  According to Mr. Smith, he "solely made the decision to criminally prosecute plaintiffs for each of the counts" and decided whether to file the criminal complaint, who to charge with crimes, the types of violations of California law to prosecute, and to charge plaintiffs with felonies versus misdemeanors.  Mr. Smith declared:

> The spillage of sewage was an instrumental factor in my decision to prosecute.  In particular, I believed there was sufficient evidence to prove beyond a reasonable doubt that Leroy Edwards, Kenneth Edwards and Roxanne Ayala conspired to violate laws regarding the pumping and release of septic waste, and committed felony violations regarding disposal of hazardous waste.  To further specify, the hazardous waste consisted of used oil filters, discarded automotive batteries and the release of used oil and other hazardous liquids by the [plaintiffs].

Prior to filing of the criminal complaint, Mr. O'Rullian and Mr. Gray were unaware that Mr. Smith planned to pursue the charges in the criminal complaint.  Mr. O'Rullian and Mr. Gray state in their declarations that the did not urge Mr. Smith or anyone in his office to prosecute plaintiffs regarding any portion of the criminal complaint.  Mr. O'Rullian and Mr. Gray were neither asked to review nor reviewed the criminal complaint prior to its filing.  Neither Mr. O'Rullian nor Mr. Gray saw the criminal complaint prior to its filing.

On April 26, 2001, Lara Kimm ("Ms. Kimm"), an employee with the wastewater division of the City's Public Works Department, sent Mr. Smith a fax to note that although liquid and soil samples taken from the Cottonwood property on June 7, 2000 were positive for a constituent of crude/waste oil, the samples did not constitute hazardous waste in that the concentration of crude/waste did not exceed the requisite threshold for hazardous waste.  According to Mr. Smith, Ms. Kimm's information "did not impact" his analysis of count two in light of the presence of apparent hazards in addition to liquid in tanks, the subject of the samples referred to by Ms. Kimm.

### *Probable Cause Determination*

On May 7, 2001, the Kern County Superior Court granted a motion to severe the criminal action against Ms. Ayala.  On May 8 and 9, 2001, a preliminary hearing was conducted as to Leroy and Kenneth in the criminal action, and ultimately, Leroy and Kenneth were bound over for trial on the criminal complaint's four counts and pursuant the presiding judicial commissioner's finding of probable cause on the criminal complaint's four counts.  At the request of the District Attorney's Office, Mr. Gray testified at the preliminary hearing although he did not speak to Mr. Smith about his testimony prior to

7

1   giving it. Mr. O'Rullian neither testified nor participated at the preliminary hearing. Mr. Smith declares

2   that neither Mr. Gray nor Mr. O'Rullian affected Mr. Smith's decisions regarding witnesses, evidence,

3   objections or other matters at the preliminary hearing.

4   _____ In the criminal action, Mr. Smith filed a May 22, 2001 information, which incorporated the

5   criminal complaint's allegations.

6   On May 31, 2001, Mr. Smith dismissed count three against Ms. Ayala based on, as he declares,

7   "the furtherance of justice, not upon any belief that Roxane Ayala was innocent or that there was

8   insufficient evidence to sustain a conviction, but upon my subjective belief that a misdemeanor

9   conviction was an outcome that was unsatisfactory."

10  On July 5, 2001, Leroy and Kenneth filed their California Penal Code section 995 motion to

11  appeal the preliminary hearing's probable cause determination as to the criminal complaint's four counts.

12  According to the County defendants, the motion was premised on insufficient evidence to hold Leroy

13  and Kenneth to answer. A Kern County Superior Court judge denied the motion, and Leroy and Kenneth

14  pursued no further appeal of the probable cause determination.

15  *Trial Proceedings*

16  On July 17, 2001, trial commenced in the criminal action against Leroy and Kenneth with Mr.

17  Smith as prosecutor. At the request of the District Attorney's Office, Mr. Gray testified at trial although

18  he did not speak to Mr. Smith about his testimony prior to giving it. Mr. O'Rullian neither testified nor

19  participated at trial. Mr. Smith declares that neither Mr. Gray nor Mr. O'Rullian affected Mr. Smith's

20  decisions regarding witnesses, evidence, objections, jury selection or other matters at trial.

21  At the close of the prosecution case, Leroy and Kenneth brought a motion, in part, to dismiss

22  count two. Subsequent to argument with the presiding superior court judge but prior to the judge's

23  ruling on Leroy and Kenneth's motion, Mr. Smith made a motion to dismiss count two "in the interest

24  of justice" because it was not "the thrust of the case." Mr. Smith declares he did not seek to dismiss

25  count two "because of a lack of evidence. Rather, the dismissal of Count II was requested by me be

26  because it was considered an ancillary count secondary to the more pertinent counts enumerated in the

27  Information." Mr. Smith further notes that he did not indicate "the dismissal was due to insufficient

28  evidence which might implicate Kenneth Edwards' and Leroy Edwards' innocence."

Although he raised a question as to substantial evidence, the trial judge denied Leroy and Kenneth's motion to dismiss count three.  After a brief dialogue with the trial judge, Mr. Smith voluntarly made a motion to dismiss the remaining counts, including count three, "in the interest of justice."  The trial judge granted the motion to dismiss the remaining counts.  Mr. Smith further declares he dismissed counts two and three "not upon any belief that Kenneth Edwards and Leroy Edwards were innocent or that there was insufficient evidence to sustain a conviction, but upon my subjective belief that a misdemeanor conviction was an outcome that was unsatisfactory."

Pursuant to a written Terms of Agreement form, Mr. Smith and Ms. Ayala's counsel agreed to dismiss all counts against Ms. Ayala.  On July 27, 2001, Mr. Smith dismissed count two as to Ms. Ayala and as Mr. Smith declares "not upon any belief that Roxanne Ayala was innocent or that there was insufficient evidence to sustain a conviction, but upon my subjective belief that a misdemeanor conviction was an outcome that was unsatisfactory."

**EHS Permit Revocation Proceedings**

A business which utilizes a "sewer pumping vehicle" or a vehicle to service portable toilets, such as those of plaintiffs, must obtain an EHS health permit for each vehicle.  Under the Kern County Ordinance Code, EHS may suspend or revoke a health permit if EHS finds that a business violated applicable law or regulations.

After an evidentiary hearing, an EHS hearing officer issued his September 20, 2001 decision to revoke health and safety registrations to operate a sewage pumping business and toilet rental agency in Kern County held in the name of Ms. Ayala, dba Action Sewer Pumping and including a pending registration application for 2001.  The decision further denied Action's pending health permit applications for 2000-2001.  More specifically, the hearing officer found that Action failed to report a sewage spill at the Cottonwood property on June 7, 2000 and pumped non-permitted wastes.

On October 5, 2001, Ms. Ayala filed in Kern County Superior Court a petition for writ of administrative mandate to challenge the EHS hearing officer's decision.  After EHS' successful demurrer, Ms. Ayala filed a first amended petition on February 25, 2002.  The trial court conducted a June 4, 2002 hearing on the first amended petition and issued a September 3, 2002 decision to hold that the hearing officer's factual findings were supported by evidence.  Ms. Ayala appealed to the California

9

1   Court of Appeal, Fifth District after the trial court's  formal September 30, 2002 order to deny Ms.

2   Ayala's writ petition.

3          The Court of Appeal issued its May 12, 2004 decision to affirm the trial court and observed that

4   "[m]ost of the allegations against ASP [Action] concerned either its use of nonpermitted and

5   unregistered vehicles to pump sewage, or its storage, transfer, and/or disposal of sewage at unapproved

6   locations." The Court of Appeal concluded that "the evidence in the administrative record fully supports

7   the trial court's conclusion. [Ms.] Ayala failed to satisfy her burden to demonstrate that EHS's

8   administrative findings were contrary to the great weight of the evidence."

9                          **Plaintiffs' Malicious Prosecution Claims**

10          On July 12, 2002, plaintiffs filed their original complaint to allege civil rights violations to

11   initiate this action. The parties engaged in extensive law and motion to culminate in plaintiffs' operative

12   fifth amended complaint ("complaint"), filed July 14, 2004.   The complaint pursues malicious

13   prosecution claims against the County defendants.

14          The complaint challenges the validity of the criminal complaint's counts two and three.  The

15   complaint alleges that Mr. O'Rullian, Mr. Gray and Mr. Buss "spent substantial time on the plaintiffs'

16   properties, knew of the contents thereon and had personal knowledge that the charges made in the

17   second and third counts of the Criminal Information were untrue."  The complaint further alleges

18   defendants conducted no scientific testing to support the presence of hazardous waste on plaintiffs'

19   properties.  The complaint alleges the absence of facts to support the criminal complaint's count three

20   in that Ms. Kinney and Ms. Honeycutt paid plaintiffs $225 for four hours of driving and work to pump

21   their septic tank on a Sunday although the pumping did not cure their septic tank blockage.  According

22   to the complaint, Mr. O'Rullian, Mr. Gray and Mr. Buss "were aware that there were no facts to support

23   the second and third causes of action for the criminal information and each participated in the

24   commencement of the criminal prosecution by conspiring together by either directly signing, or

25   encouraging, counseling or inciting the signing of the criminal complaint and by investigating in bad

26   faith." The complaint claims the County and City defendants attempted to overburden plaintiffs with

27   / / /

28   / / /

10

1    multiple legal proceedings to reflect their "malicious attitude."[7]

2        As to EHS, the complaint appears to allege that management personnel, including Mr. O'Rullian,

3    created a policy to "financially destroy" plaintiffs, "to incarcerate them and to turn their clients away

4    from them . . . and to punish them financially and emotionally." As damages, the complaint alleges

5    plaintiffs' legal expenses in connection with the criminal action, injury to personal and business

6    reputations, anxiety, fear and apprehension.

7        The County defendants seek summary judgment on grounds that plaintiffs are unable to establish,

8    and evidence negates, elements of plaintiffs' malicious prosecution and *Monell* claims.  Mr. O'Rullian

9    and Mr. Gray further claim that they are entitled to qualified immunity to bar plaintiffs' malicious

10   prosecution claims.

11       On March 17, 2006, after receiving a two-week extension, plaintiff's, disobeying this Court's

12   standing order on page limitations, filed a 92-page memorandum of points and authorities and a 56-page

13   response to the Kern County defendants' undisputed facts.  Plaintiffs' papers are rambling and

14   disjointed.  In sum, plaintiffs contend that: (1) they were denied "the right to be prosecuted fairly"; (2)

15   they were prosecuted when the "agents knew by the lack of evidence these plaintiffs were innocent"; (3)

16   plaintiff's rights were deprived maliciously and in bad faith; and (4) plaintiffs suffered injury in "an

17   escalation of harassment."

18                                   **DISCUSSION**

19                              **Summary Judgment Standards**

20       F.R.Civ.P. 56(b) permits a party against whom a claim is asserted to seek "summary judgment

21   in the party's favor upon all or any part thereof."  Summary judgment is appropriate when there exists

22   no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

23   F.R.Civ.P. 56(e); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348,

24   1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

25   The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see

26   

27           [7]      In their summary judgment opposition papers, plaintiffs take the position "that the government and their
28   [sic] agents, knew or had all of the information to know the truth, but disregarded that knowledge in order to 'felonize' and
     destroy by misuse of the judicial process these persons with whom they had been unsuccessful in imposing legal restraint."

                                            11

1   whether there is a genuine need for trial." *Matsushita Elec.*, 475 U.S. at 586, n. 11, 106 S.Ct. 1348;

2   *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

3       On summary judgment, a court must decide whether there is a "genuine issue as to any material

4   fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c); *Covey v.*

5   *Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398

6   U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct.

7   486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

8   The evidence of the party opposing summary judgment is to be believed and all reasonable inferences

9   that may be drawn from the facts before the court must be drawn in favor of the opposing party.

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587,

11   106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require

12   submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

13   *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

14       To carry its burden of production on summary judgment, a moving party "must either produce

15   evidence negating an essential element of the nonmoving party's claim or defense or show that the

16   nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

17   persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

18   Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

19   1990).  A "complete failure of proof concerning an essential element" of plaintiff's case is sufficient to

20   grant summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552 (1986).

21   "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court

22   that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895

23   F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.  Only disputes

24   over facts that might affect the outcome of the suit under the governing law will properly preclude the

25   entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

26       "If a moving party fails to carry its initial burden of production, the nonmoving party has no

27   obligation to produce anything, even if the nonmoving party would have the ultimate burden of

28   persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *See Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

1    "If, however, a moving party carries its burden of production, the nonmoving party must produce

2    evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

3    at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

4    fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

5    *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 ("Rule 56(c) mandates the entry of summary judgment, after

6    adequate time for discovery and upon motion, against a party who fails to make the showing sufficient

7    to establish the existence of an element essential to that party's case, and on which that party will bear

8    the burden of proof at trial.") "But if the nonmoving party produces enough evidence to create a genuine

9    issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see*

10   *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue

11   of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth

12   at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v.*

13   *Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a

14   scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at

15   252, 106 S.Ct. 2505.

16   _____As discussed below, the County defendants have met their summary judgment burden to negate

17   elements of plaintiffs' malicious prosecution and *Monell* claims and to demonstrate the absence of

18   genuine issues of material fact and that they are entitled to judgment as a matter of law.

19                              **Malicious Prosecution Elements**

20          In the Ninth Circuit, the general rule is that a malicious prosecution claim is not cognizable under

21   section 1983 if process is available in the state judicial system to provide a remedy.  *Usher v. City of Los*

22   *Angeles*, 828 F.2d 556, 561 (9th Cir. 1987); *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (en

23   banc); *Cline v. Brusett*, 661 F.2d 108, 112 (9th Cir. 1981).  Nonetheless, "an exception exists to the

24   general rule when a malicious prosecution is conducted with the intent to deprive a person of equal

25   protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights."

26   *Bretz*, 773 F.2d at 1031; *Cline*, 661 F.2d at 112.

27          A malicious prosecution claim under section 1983 is based on state law elements. *See Usher*,

28   828 F.2d at 562. The essential elements of malicious prosecution are the same in criminal and civil

13

1   contexts.   The malicious prosecution plaintiff must plead and prove that the prior proceeding,

2   commenced by or at the direction of the malicious prosecution defendant, was: (1) pursued to a legal

3   termination favorable to the plaintiff; (2) brought without probable cause; and (3) initiated with malice.

4   *Villa v. Cole*, 4 Cal.App.4th 1327, 1335, 6 Cal.Rptr.2d 644, 648 (1992).   To prevail, a malicious

5   prosecution plaintiff "must show that the defendants prosecuted her with malice and without probable

6   cause, and that they did so for the purpose of denying her equal protection or another specific

7   constitutional right."   *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

8   <u>**Initiation Of Criminal Action**</u>

9        Mr. O'Rullian and Mr. Gray contend plaintiffs' malicious prosecution claims fail in that Mr.

10  O'Rullian and Mr. Gray did not initiate prosecution of the criminal action or were were "actively

11  instrumental" to initiate the criminal action.   Mr. O'Rullian and Mr. Gray argue that Mr. Smith "initiated

12  the prosecution of plaintiffs."

13        Malicious prosecution actions are not limited to suits against prosecutors and may be pursued

14  against other persons who have wrongfully caused the charges to be filed.   *Awabdy v. City of Adelanto*,

15  368 F.3d 1062, 1066 (9th Cir. 2004); *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-1127 (9th

16  Cir. 2002).   Generally, the decision to file a criminal complaint is presumed to result from an

17  independent determination by the prosecutor and thus precludes liability for those who participated in

18  the investigation or filed a report that resulted in initiation of proceedings.   *Awabdy*, 368 F.3d at 1067;

19  *Smiddy v. Varney*, 665 F.2d 261, 266-268 (9th Cir. 1981), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65

20  (1982).   Nonetheless, the presumption of prosecutorial independence does not bar a subsequent section

21  1983 claim "against state or local officials who improperly exerted pressure on the prosecutor,

22  knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in

23  wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal

24  proceedings."   *Awabdy*, 368 F.3d at 1067; *see Galbraith*, 307 F.3d at 1126-1127.

25        Mr. O'Rullian and Mr. Gray point out that Mr. Smith, a prosecutor, was responsible to initiate

26  the criminal action and caused filing of the criminal complaint. Mr. O'Rullian and Mr. Gray note that

27  their duties as an EHS environmental specialist and environmental health technician, respectively,

28  focused on compliance with septic pumper's health permits and environmental laws. Mr. O'Rullian and

14

Mr. Gray attribute Mr. Smith as determining probable cause existed to prosecute plaintiffs independent of Mr. O'Rullian and Mr. Gray. Mr. O'Rullian and Mr. Gray point to Mr. Smith's declaration that Mr. Smith solely decided to prosecute plaintiffs on count two after review of reports, photographs, interviews and lab results and after visiting and viewing plaintiffs' properties. Mr. O'Rullian and Mr. Gray further note Mr. Smith's declaration that he conducted an independent investigation relative to count three and interviewed Ms. Kinney and Ms. Honeycutt. Mr. O'Rullian and Mr. Gray point out that Mr. Smith decided whether to file the criminal complaint, whom to charge, the types of violations of California law to charge, and whether to charge felonies versus misdemeanors.

In addition, Mr. O'Rullian and Mr. Gray point to their declarations that they were unaware that Mr. Smith planned to prosecute plaintiffs on the charges in the criminal complaint and that they did not urge Mr. Smith or anyone in his office to prosecute plaintiffs in regards to any portion of the criminal action. Mr. O'Rullian and Mr. Gray note that they neither were asked to review nor reviewed the criminal complaint prior to its filing. Mr. O'Rullian and Mr. Gray further note they did not see the criminal complaint until after its filing.

In their rambling, disjointed papers, plaintiffs concentrate on the actions and states of mind of Mr. Smith, the non-party prosecutor, and Mr. Buss, the City code enforcement officer who was granted summary judgment. Plaintiffs point to Ms. Kinney's testimony that Mr. Smith committed to pay her the $225 cost of Leroy and Kenneth's septic pumping job if the court did not require Leroy and Kenneth to repay the amount. Plaintiffs claim that, according to Ms. Kinney, Mr. O'Rullian told her that if she and Ms. Honeycutt testified, they would get their money back. However, a reading of Ms. Kinney's testimony reveals Mr. O'Rullian did not promise to pay her and, at most, indicated that restitution may be available if Ms. Kinney and Ms. Honeycutt testified.

As this Court found in its prior summary judgment decision, the record is clear that Mr. Smith initiated the criminal action against plaintiffs. The evidence demonstrates that Mr. O'Rullian and Mr. Gray's actions, viewed most favorably to plaintiffs, were tangential to initiation of the criminal action. There is no dispute that Mr. O'Rullian and Mr. Gray acted solely as an EHS environmental specialist and environmental health technician, respectively, and that Mr. Smith, not Mr. O'Rullian or Mr. Gray, decided whether to file the criminal complaint, whom to charge with crimes, the types of violations

15

which to prosecute plaintiffs, and whether to charge plaintiffs with felonies or misdemeanors. Mr. Smith, not Mr. O'Rullian or Mr. Gray, was the prosecutorial force behind the criminal action. Even construing the evidence most favorable to plaintiffs, nothing suggests that Mr. O'Rullian or Mr. Gray initiated or directed the criminal action against plaintiffs.

**Absence Of Prosecutorial Deception**

Mr. O'Rullian and Mr. Gray further contend they did not improperly pressure or deceive Mr. Smith to file the criminal complaint. Mr. O'Rullian points out that although he prepared reports on inspections of plaintiffs' properties, he noted no violations of California Health and Safety Code section 25189.5, the subject of count two. Mr. O'Rullian notes his minimal involvement with events surrounding count three and that he received a complaint from Ms. Kinney or Ms. Honeycutt and referred the matter to Mr. Smith. Mr. O'Rullian further notes that he testified at neither the criminal action's preliminary hearing nor trial and had no involvement with Mr. Smith at the preliminary hearing or trial.

Mr. Gray notes that he did not participate in the June 7, 2000 inspection of the Cottonwood property and prepared no reports of inspections of plaintiffs' properties. Mr. Gray points out that like Mr. O'Rullian, he was neither aware of nor reviewed the criminal complaint prior to its filing. Mr. Gray notes that after he reviewed the criminal complaint, he raised with Mr. Smith the issue that waste oil as a constituent in a liquid tank did not necessarily qualify the liquid as hazardous. Mr. Gray declared that although he testified at the preliminary hearing and trial, he did not meet with Mr. Smith prior to testifying. Mr. Gray further notes that like Mr. O'Rullian, Mr. Gray had no effect on Mr. Smith's decisions at the criminal action's preliminary hearing or trial. Lastly, Mr. Gray points out that he had no involvement as to count three.

Plaintiffs argue that since Mr. O'Rullian, Mr. Gray, Mr. Buss and Mr. Smith shared information, "it is reasonable to believe that they all knew what one knew, unless Smith intentionally lied or withheld information from Buss, or the others did not communicate to Buss the true state of affairs." Without supporting authority, plaintiffs claim that "Mr. O'Rullian knew that there was no hazardous waste and that was not an issue because if it had been, by virtue of its dangerousness, another more qualified county agency would have been involved to make proper decisions relating to that issue." According

16

1   to plaintiffs, Mr. Smith prosecuted plaintiffs "out of malice or ignorance or a combination of both

2   ignoring the facts" and the malice was supplied by Mr. O'Rullian, Mr. Gray and Mr. Buss.

3        The record reveals no genuine issue of material fact that Mr. O'Rullian or Mr. Gray attempted

4   to deceive Mr. Smith to wrongfully prosecute plaintiffs.  There is an absence of evidence that Mr.

5   O'Rullian or Mr. Gray improperly exerted pressure on Mr. Smith, knowingly provided misinformation

6   to Mr. Smith, concealed exculpatory evidence, or engaged in wrongful or bad faith conduct.  As noted

7   in the County defendants' reply papers, Mr. O'Rullian and Mr. Gray viewed on plaintiffs' properties

8   material which had characteristics of hazardous waste under the California Code of Regulations and

9   which plaintiffs were obliged to determined were not hazardous.  *See* 22 C.C.R. § 66262.11.  Plaintiffs

10  provide no factual support for their claim that "[t]hese men supplied the information and supplied the

11  ill will upon which the case was prosecuted."  The record is devoid of support of prosecutorial

12  deception.  Plaintiffs hyperbole does not suffice.

13                                      **Favorable Termination**

14       Mr. O'Rullian and Mr. Gray contend that dismissal of the criminal charges against plaintiffs is

15  not "favorable termination" and thus plaintiffs fail to establish that element of their malicious

16  prosecution claims.  Mr. O'Rullian and Mr. Gray note the absence of dispute that Mr. Smith dismissed

17  counts two and three "in the furtherance of justice."  Plaintiffs respond "there was a favorable

18  termination for the plaintiffs as favorable as if they acquitted [sic] on all charged."

19       In *Jaffe v. Stone*, 18 Cal.2d 146, 149, 114 P.2d 335, 338 (1941), the California Supreme Court

20  addressed the effect of dismissal of criminal charges on a malicious prosecution claim:

21           It is not enough, however, merely to show that the proceeding was dismissed.
        The theory underlying the requirement of favorable termination is that it tends to indicate
22      the innocence of the accused, and coupled with the other elements of lack of probable
        cause and malice, establishes the tort, that is, the malicious and unfounded charge of a
23      crime against an innocent person. . . . Hence, if the criminal proceeding goes to trial, it
        is ordinarily necessary, as a foundation for a malicious prosecution suit, that the plaintiff
24      have been acquitted. . . . The same fundamental theory is applied in testing a dismissal
        or other termination without a complete trial on the merits.  If it is of such a nature as to
25      indicate the innocence of the accused, it is a favorable termination sufficient to satisfy
        the requirement.  If, however, the dismissal is on technical grounds, for procedural
26      reasons, or for any other reason not inconsistent with his guilt, it does not constitute
        favorable termination.

27

28  As to matters terminated short of trial completion, the California Court of Appeal has explained:

                                                    17

> Whether or not the termination of an action prior to a determination on the merits tends to indicate innocence on the part of the defendant of the acts with which he is charged must depend on whether the manner of termination reflects on the merits of the matter. In some instances the manner of termination reflects the opinion of the court that the action lacks merit, as where criminal proceedings are dismissed for lack of sufficient evidence of guilt following a preliminary hearing. . . . In others, the termination reflects the opinion of the prosecuting party that, if pursued, the action would result in a decision in favor of the defendant, as where the district attorney seeks dismissal of the prosecution of a criminal action for lack of evidence . . . or where the plaintiff in a civil proceeding voluntarily dismisses the action . . .

*Minasian v. Sapse*, 80 Cal.App.3d 823, 827, 145 Cal.Rptr. 829, 832 (1978).

Mr. O'Rullian and Mr. Gray point out that at the end of the prosecution's case at Leroy and Kenneth's trial, their defense counsel brought a motion, in part, to dismiss count two and that prior to ruling, Mr. Smith made a motion to dismiss count two "in the interest of justice" because it was not "the thrust of the case."   Mr. Smith declares that he did not seek to dismiss count "because of a lack of evidence" but because he considered count two "secondary to the more pertinent counts."  Mr. Smith further declared that he did not indicate "the dismissal was due to insufficient evidence which might implicate" Leroy or Kenneth's innocence.

As to count three, Mr. O'Rullian and Mr. Gray note that the trial judge denied Leroy and Kenneth's motion to dismiss count three but that Mr. Smith voluntarily made a subsequent motion to dismiss remaining counts, including count three, "in the interest of justice." Mr. O'Rullian and Mr. Gray characterize the trial court's denial of Leroy and Kenneth's motion as a ruling that there was sufficient evidence for the matter to be presented to a jury.  Mr. Smith declared that he dismissed counts two and three "not upon any belief that Kenneth Edwards and Leroy Edwards were innocent or that there was insufficient evidence to sustain a conviction, but upon my subjective belief that a misdemeanor conviction was an outcome that was unsatisfactory."

Leroy and Kenneth were not acquitted of the counts two and three in that Mr. Smith dismissed them prior to a jury resolution.  Leroy and Kenneth cannot rest on the mere dismissal of the counts in that the dismissals by themselves do not indicate their innocence.  The record is bear of evidence that counts two and three were dismissed for reasons hinting of absence of guilt.  There is no tribunal finding that counts two and three lacked merit, especially given the preliminary hearing ruling and Leroy and Kenneth's unsuccessful appeal of it.  In his declaration, Mr. Smith indicates he dismissed counts two

and three for reasons other than Leroy and Kenneth's innocence.  A dismissal of criminal proceedings "in the interests of justice" is ambiguous as this term "implies considerations which would favor each side to this litigation."  *De La Riva v. Owl Drug Co.*, 253 Cal.App.2d 593, 600, 61 Cal.Rptr 291, 296 (1967).  The record and reasonable inferences therefrom indicate the criminal action was not terminated to indicate Leroy and Kenneth's innocence or in favor of Leroy and Kenneth for malicious prosecution purposes.

As to Ms. Ayala, the criminal action did not proceed to trial against her.  As reflected in a written form agreement, Mr. Smith and Ms. Ayala's counsel stipulated to dismiss all counts against Ms. Ayala. Mr. Smith dismissed count two as to Ms. Ayala on July 27, 2001 and declared that he did so "not upon any belief that Roxanne Ayala was innocent or that there was insufficient evidence to sustain a conviction, but upon my subjective belief that a misdemeanor conviction was an outcome that was unsatisfactory."   The record indicates that Ms. Ayala reached a settlement agreement with the prosecution to reflect ambiguity and to leave unresolved her guilt or innocence for malicious prosecution purposes.  A dismissal resulting from negotiation, settlement or consent is generally not deemed a favorable termination of the proceeding. *Webb v. Youmans*, 248 Cal.App.2d 851, 853, 57 Cal.Rptr. 11 (1967).  In such a case, the dismissal reflects ambiguously on the merits of the action as it results from the joint action of the parties, thus leaving open the question of defendant's guilt or innocence. *Minasian*, 80 Cal.App.3d at 827, n. 4, 145 Cal.Rptr. at 832, n. 4.  The record and reasonable inferences therefrom indicate that counts two and three were not terminated in favor of Ms. Ayala for malicious prosecution purposes.  Plaintiffs point to no evidence to raise a question otherwise.

### Probable Cause – Collateral Estoppel

Mr. O'Rullian and Mr. Gray contend that since probable cause was judicially established at the preliminary hearing in the criminal action, collateral estoppel negates the absence of probable cause element of their malicious prosecution claims.

"Collateral estoppel precludes relitigation of issues argued in prior proceedings."  *Lucido v. Superior Court*, 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 769 (1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2021 (1990).  Collateral estoppel applies to the section 1983 context in that there is "no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity

1   to relitigate an issue already decided in state court." *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411

2   (1980).  "A party's ability to relitigate an issue decided in a prior state court determination depends on

3   the law of the state in which the earlier litigation occurred." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105

4   (10th Cir. 1998).

5         Threshold requirements to apply collateral estoppel are:

6        1.    The issue sought to be precluded from relitigation must be **identical** to that decided in

7             a former proceeding;

8        2.    The issue must have been **actually litigated** in the former proceeding;

9        3.    The issue must have been **necessarily decided** in the former proceeding;

10       4.    The decision in the former proceeding must be **final and on the merits**; and

11       5.    The party against whom preclusion is sought must be the **same as, or in privity with**,

12             the party to the former proceeding.

13   *Lucido*, 51 Cal.3d at 341, 272 Cal.Rptr.2d at 769.

14         In the malicious prosecution context, probable cause is a suspicion founded on circumstances

15   sufficiently strong to warrant a reasonable man to believe that the charge is true.  *Centers v. Dollar*

16   *Markets*, 99 Cal.App.2d 534, 540, 222 P.2d 136, 141 (1950).  To recover compensatory damages, the

17   malicious prosecution plaintiff bears the burden to prove that the defendant did not have reasonable

18   grounds to believe that the facts alleged in the complaint were true.  *Centers*, 99 Cal.App.2d at 540, 222

19   P.2d at 141.  The California Court of Appeal in *Centers*, 99 Cal.App.2d at 540-541, 222 P.2d at 141,

20   further explained:

21        Probable cause does not depend upon the possession of facts which satisfactorily prove
       the guilt of an accused person.  It has reference to the common standard of human

22        judgment and conduct.  It exists if one is possessed of information or facts which are
       sufficient to cause a reasonable person to honestly believe the charge is true. . . . Proof

23        of the favorable termination of the criminal proceeding does not create a conflict on the
       issue of probable cause. . . . Proof that no crime was committed or that the accused is

24        innocent does not negative the existence of probable cause.  (Citations omitted.)

25         Mr. O'Rullian and Mr. Gray contend that plaintiffs are collaterally estopped to relitigate probable

26   cause as to counts two and three of the criminal complaint because at the criminal action's preliminary

27   hearing, the judicial commissioner found probable cause existed to bind plaintiffs over for trial, and a

28   superior court judge denied Leroy and Kenneth's motion to attempt to overturn the probable cause

1    determination.

2        "The purpose of the preliminary hearing is to weed out groundless or unsupported charges of

3    grave offenses, and to relieve the accused of the degradation and expense of a criminal trial." *Jaffe*, 18

4    Cal.2d at 149, 114 P.2d at 337.  A long-standing principle of California common law is that "a decision

5    by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes *prima facie*

6    – but not *conclusive* – evidence of probable cause." *Awabdy*, 368 F.3d at 1067 (italics in original).

7    "Among the ways that a plaintiff can rebut a *prima facie* finding of probable cause is by showing that

8    the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other

9    wrongful conduct undertaken in bad faith." *Awabdy*, 368 F.3d at 1067.

10                              ***Identical Issues***

11   _____Mr. O'Rullian and Mr. Gray contend that probable cause litigated at the preliminary hearing in

12   the criminal action is identical to the probable cause issue in this action in that the preliminary hearing

13   addressed probable cause for counts two and three of the criminal complaint.

14       "The application of the doctrine of collateral estoppel depends on whether the *issue* in both

15   actions is the same, not whether the issue arises in the same *context*." *First N.B.S. Corp. v. Gabrielsen*,

16   179 Cal.App.3d 1189, 1195-1196, 225 Cal.Rptr. 254, 257 (1986) (italics in original).  "[A] prior judicial

17   determination at a preliminary hearing that there was sufficient evidence to hold the plaintiff over for

18   trial may, in some situations, preclude the plaintiff from relitigating the issue of probable cause to arrest

19   in a subsequent civil suit." *McCutchen v. City of Montclair*, 73 Cal.App.4th 1138, 1147, 87 Cal.Rptr.2d

20   95, 101 (1999); *see Haupt v. Dillard*, 17 F.3d 285, 290 (9th Cir. 1994) ("Because lack of probable cause

21   is an element of a claim of malicious prosecution . . . and because [plaintiff] is collaterally estopped from

22   relitigating that issue, the district court properly granted summary judgment for the defendants.")

23       As to Leroy and Kenneth, there is no apparent distinction in the probable cause issues addressed

24   at the preliminary hearing in the criminal action and here.  The preliminary hearing addressed, among

25   other things, whether probable cause existed to prosecute Leroy and Kenneth on counts two and three,

26   which are at issue here.  Mr. O'Rullian and Mr. Gray demonstrate sufficient identity of issues to apply

27   collateral estoppel to the malicious prosecution claims here.  Plaintiffs raise no genuine question as the

28   identical issues factor.

1

***Actually Litigated And Necessarily Decided Issue***

2        Mr. O'Rullian and Mr. Gray argue that the issue of probable cause was actually and necessarily

3   litigated at the preliminary hearing, the purpose of which was to determine if there was sufficient cause

4   to bind Leroy and Kenneth over for trial.

5        In *Haupt*, 17 F.3d 285, the malicious prosecution plaintiff argued that because he was acquitted

6   in the underlying criminal trial and because the probable cause determination at his preliminary hearing

7   was not necessary to support that judgment, the issue was not "necessarily decided" as required by state

8   tort (malicious prosecution) law.  The Ninth Circuit disagreed:

9            In fact, the probable cause determination *was* necessary to the judgment; the sole purpose
            of the preliminary hearing was to determine whether [plaintiff] should have been bound
10           over for trial.  But for the probable cause determination, there would have been no trial
            and no judgment of acquittal.

11

12   *Haupt*, 17 F.3d at 289.

13        As to Leroy and Kenneth, there is no doubt that the probable cause issue was actually and

14   necessarily litigated at the preliminary hearing and that those factors of collateral estoppel are met as to

15   Leroy and Kenneth.  Plaintiffs raise no genuine question as to the actually litigated and necessarily

16   decided factors.

17

***Final Decision On Merits***

18        Mr. O'Rullian and Mr. Gray argue that the preliminary hearing's probable cause determination

19   became final when the superior court judge denied Leroy and Kenneth's Penal Code section 995 appeal

20   of the judicial commissioner's probable cause determination and Leroy and Kenneth failed to seek

21   further appeal.

22        To be a final determination for collateral estoppel purposes, a determination need not be a final

23   judgment but "sufficiently firm to be accorded conclusive effect."  *Luben Industries, Inc. v. United*

24   *States*, 707 F.2d 1037, 1040 (9th Cir. 1983). The California Court of Appeal has further explained:

25           A finding of probable cause to hold the defendant over for trial is a final judgment on the
            merits for the purposes of collateral estoppel under the California law because the
26           accused can (1) immediately appeal the determination by filing a motion to set aside the
            preliminary hearing (Pen. Code, § 995) and (2) obtain review of the decision on the
27           motion to set aside the preliminary hearing by filing a writ of prohibition (Pen. Code, §
            999a).  Also, the issue of probable cause cannot be litigated further because it cannot be
28           used as a defense at trial.

22

1    *McCutchen*, 73 Cal.App.4th at 1145-1146, 87 Cal.Rptr.2d at 100.

2        As to Leroy and Kenneth, there can be no doubt that the probable cause issue was finally

3    terminated on the merits with the superior court's denial of Leroy and Kenneth's Penal Code section 995

4    appeal of the probable cause determination.   Plaintiffs raise no genuine question as to the final

5    termination factor.

6                                    ***Same Parties Or Privity***

7        Mr. O'Rullian and Mr. Gray contend that plaintiffs were the same parties to the preliminary

8    hearing or in privity for collateral estoppel purposes.

9        Privity refers to "a relationship between the party to be estopped and the unsuccessful party in

10   the prior litigation which is 'sufficiently close' so as to justify application of the doctrine of collateral

11   estoppel." *Clemmer v. Hartford Ins. Co.*, 22 Cal.3d 865, 875, 151 Cal.Rptr. 285 (1978).   The California

12   Supreme Court has explained:

13          In the context of collateral estoppel, due process requires that the party to be estopped
            must have had an identity or community of interest with, an adequate representation by,
14          the losing party in the first action as well as the circumstances must have been such that
            the party to be estopped should reasonably have expected to be bound by the prior
15          adjudication.   Thus, in deciding whether to apply collateral estoppel, the court must
            balance the rights of the party to be estopped against the need for applying collateral
16          estoppel in the particular case, in order to promote judicial economy by minimizing
            repetitive litigation, to prevent inconsistent judgments which undermine the integrity of
17          the judicial system, or to protect against vexatious litigation.

18   *Clemmer*, 22 Cal.3d at 875, 151 Cal.Rptr. 285 (citations omitted).

19       Collateral estoppel has been applied against nonparties who had a proprietary or financial interest

20   in and control of a prior action.   *Lynch v. Glass*, 44 Cal.App.3d 943, 949, 119 Cal.Rptr. 139 (1975).

21   Collateral estoppel further applies when the nonparty has such an interest "in the determination of a

22   question of fact or law with reference to the same subject matter or transaction." *Stafford v. Russell*, 117

23   Cal.App.2d 319, 320, 255 P.2d 872 (1953), *cert. denied*, 346 U.S. 926, 74 S.Ct. 315 (1954).

24       Mr. O'Rullian and Mr. Gray point out that Leroy and Kenneth were common parties to the

25   criminal action's preliminary hearing and this action.   Mr. O'Rullian and Mr. Gray argue that Ms. Ayala

26   was in privity with Leroy and Kenneth in that the facts, overt acts and counts enumerated in the criminal

27   complaint are identical with respect to each of the three plaintiffs.   Mr. O'Rullian and Mr. Gray contend

28   that plaintiffs "had a sufficient identity and commonality of interests" in that Action was a "family

business" for the benefit of plaintiffs and Ms. Temple.  To demonstrate shared identity and commonality of interest among plaintiffs, Mr. O'Rullian and Mr. Gray point out that: (1) plaintiffs are related, and Kenneth and Ms. Temple are married; (2) Ms. Ayala held herself out as Action's owner; (3) Leroy, Kenneth and Ms. Temple worked for Action; (4) Action's profits were split among plaintiffs and Ms. Temple and used for plaintiffs' benefit; (5) Ms. Ayala paid Leroy's rent from Action's account for his work; and (6) Kenneth owned the Cottonwood property which was Action's designated storage yard, and Action paid Kenneth for use of his Cottonwood property.

Mr. O'Rullian and Mr. Gray further note that in his closing remarks at the preliminary hearing, counsel for Leroy and Kenneth stated that Ms. Ayala "is already obligated to comply with all the laws in the maintenance of her business." Mr. O'Rullian and Mr. Gray attribute defense counsel's comment to suggest that "there were no continuing environmental violations" by Leroy and Kenneth given that Ms. Ayala "was complying with a temporary restraining order in civil court." Thus, Mr. O'Rullian and Mr. Gray conclude there is further evidence of an "inextricable relationship" among plaintiffs such that Ms. Ayala "could have reasonably expected to have been bound by the finding of probable cause at the preliminary hearing in a subsequent 42 U.S.C. § 1983 action."

As this Court noted in its prior summary judgment decision, Leroy and Kenneth clearly were and are the same parties to the preliminary hearing and this action.  Ms. Ayala was a common defendant with Leroy and Kenneth in counts two and three of the criminal complaint.  Ms. Ayala was not a party to the preliminary hearing in that the criminal action was severed as to her.  Nonetheless, Ms. Ayala, by her admission, conducted a "family" business with her father (Leroy) and brother (Kenneth), and the monies of which were split with her and used for family members.  Ms. Ayala permitted Leroy to live on her Hudson property and "pay as he would."  Plaintiffs fail to challenge meaningfully a commonality of interest among plaintiffs in the probable cause determination in the criminal action.

This Court is aware that the preliminary hearing determination in the criminal action is prima facie, not conclusive, evidence of probable cause.  *See Awabdy*, 368 F.3d at 1067.  Plaintiffs offer no meaningful evidence to refute probable cause for counts two and three.  As noted above, the evidence fails to suggest that Mr. O'Rullian or Mr. Gray induced counts two or three by fraud, corruption, perjury, fabricated evidence or other wrongful, bad faith conduct.  Based on collateral estoppel effects of the

1  preliminary hearing determination, the absence of probable cause element is negated as to plaintiffs'

2  malicious prosecution claims.

3  **Malice**

4  Mr. O'Rullian and Mr. Gray contend that plaintiffs' malicious prosecution claims fail in that

5  plaintiffs are unable to establish the element of malice directly or inferentially.  Plaintiffs allude to

6  controversies between Kern County and Leroy and Kenneth regarding maintenance of the Union

7  property.  Plaintiff claim that Kern County "lost the zoning advantage that is previously thought it had."

8  As to malice of Mr. O'Rullian, plaintiffs appear to rely on Mr. O'Rullian's alleged statement heard by

9  plaintiffs' counsel, his assistant and Ms. Temple that "these people have no idea what is in store for

10  them," made after a December 2000 hearing in the civil action.  According to plaintiffs, the

11  circumstances "surrounding the incident raises [sic] the facts from which hostility can be inferred."

12  Malice means "actuated by a wrongful motive, i.e., the party must have had in mind some evil

13  or sinister purpose." *Centers*, 99 Cal.App.2d at 541, 222 P.2d at 141.  Malice is established when "the

14  former suit was commenced in bad faith to vex, annoy or wrong the adverse party." *Centers*, 99

15  Cal.App.2d at 541, 222 P.2d at 142.  Malice must be proven against a particular defendant to justify an

16  award of compensatory damages against that defendant. *Centers*, 99 Cal.App.2d 541-542, 222 P.2d at

17  142.  Malice may be proved by direct evidence or may be inferred from all circumstances in the case.

18  *Centers*, 99 Cal.App.2d at 542, 222 P.2d at 142.  Malice may, but need not necessarily, be inferred from

19  want of probable cause. *Jackson v. Beckham*, 217 Cal.App.2d 264, 273, 31 Cal.Rptr. 739, 745 (1963);

20  *Centers*, 99 Cal.App.2d at 541, 222 P.2d at 142.

21  Mr. O'Rullian and Mr. Gray declared that they have never "harbored any animus, hostility or

22  malice towards plaintiffs" and that their "feelings toward plaintiffs are neutral." Mr. O'Rullian and Mr.

23  Gray further declared that their actions "were motivated by legitimate investigation and enforcement

24  objectives" of EHS regarding enforcement of the California Health and Safety Code and EHS health

25  permits.  In addition, Mr. Gray notes that he testified at the criminal action's preliminary hearing and

26  trial because Mr. Smith called him as a witness and that his testimony was not motivated by ill will or

27  malice toward plaintiffs. Mr. O'Rullian points out that he testified at neither the preliminary hearing nor

28  trial. For argument purposes, assuming Mr. O'Rullian and Mr. Gray harbored ill will toward plaintiffs,

1    there is no evidence that Mr. O'Rullian and Mr. Gray acted on such ill will to pursue the criminal action

2    or prosecution of plaintiffs.

3        Although plaintiffs claim that Mr. Buss had "ongoing malice toward these plaintiffs," the record

4    lacks evidence of Mr. O'Rullian or Mr. Gray's wrongful motive or evil or sinister purpose toward

5    plaintiffs.  Despite the stray, hearsay remark attributed to Mr. O'Rullian, nothing suggests that Mr.

6    O'Rullian or Mr. Gray acted in bad faith to vex, annoy or wrong plaintiffs.  The County defendants

7    correctly note that Mr. O'Rullian's remark is ambiguous as to whether it applied to EHS steps to revoke

8    Action health permits, the civil action, or something else.  Even construing the evidence and its

9    reasonable inferences most favorably to plaintiffs, a conclusion of malice is not reached.  The record is

10   clear that Mr. O'Rullian and Mr. Gray's actions at issue arose in connection with their investigation and

11   enforcement responsibilities.

12                                    **Qualified Immunity**

13       Mr. O'Rullian and Mr. Gray contend they are entitled to qualified immunity as to plaintiffs'

14   malicious prosecution claims.

15       Qualified immunity is a defense to claims against governmental officials "arising out of the

16   performance of their duties.  Its purpose is to permit such officials conscientiously to undertake their

17   responsibilities without fear that they will be held liable in damages for actions that appear reasonable

18   at the time, but are later held to violate statutory or constitutional rights."  *Kraus v. Pierce County*, 793

19   F.2d 1105, 1108 (9th Cir. 1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571 (1987).  Qualified immunity

20   protects section 1983 defendants "from liability for civil damages insofar as their conduct does not

21   violate clearly established statutory or constitutional rights of which a reasonable person would have

22   known."  *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 943 (9th Cir. 2004).  The "heart of qualified

23   immunity is that it spares the defendant from having to go forward with an inquiry into the merits of the

24   case.  Instead, the threshold inquiry is whether, assuming that what the plaintiff asserts the facts to be

25   is true, any allegedly violated right was clearly established."  *Kelley v. Borg*, 60 F.3d 664, 666 (9th Cir.

26   1995).

27       Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."

28   *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).  The privilege is "an immunity from suit

26

1   rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is

2   erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806.  Courts stress "the

3   importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v.*

4   *Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534 (1991).  "Immunity ordinarily should be decided by the court

5   long before trial." *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

6       The issue of qualified immunity is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510,

7   514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991).  As to

8   summary judgment on qualified immunity, the Ninth Circuit Court of Appeals has explained:

9           Under *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001),
        the first step in the qualified immunity analysis is "to consider the materials submitted
10      in support of, and in opposition to, summary judgment in order to decide **whether a**
        **constitutional right would be violated** if all facts are viewed in favor of the party
11      opposing summary judgment." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).  "If
        no constitutional violation is shown, the inquiry ends." *Cunningham v. City of*
12      *Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003).  On the other hand, if "the parties'
        submissions" create a triable issue of whether a constitutional violation occurred, the
13      second question is "**whether the right was clearly established**." *Saucier*, 533 U.S. at
        201, 121 S.Ct. 2151.  A constitutional right is clearly established when "it would be clear
14      to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*
        at 202, 121 S.Ct. 2151.

15

16   *Squaw Valley*, 375 F.3d at 943 (Bold added).

17       The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official

18   would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the

19   unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987).

20   "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the

21   immunity defense." *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

22       Qualified immunity "turn[s] primarily on objective factors": "Reliance on the objective

23   reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid

24   excessive disruption of government and permit the resolution of many insubstantial claims on summary

25   judgment." *Harlow v. Fitzgerald*, 457 U.S. 808, 818, 102 S.Ct. 2727 (1982).  The qualified immunity

26   standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or

27   those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 343, 341, 106 S.Ct. 1092 (1986).

28       In their complaint, plaintiffs allege the criminal action "constituted violation of plaintiffs' rights

27

under the Fourth Amendment of the United States Constitution in that the prosecution was undertaken . . . without probable cause to believe that [plaintiffs] . . . had violated the laws with which they were accused" in counts two and three.  As noted by Mr. O'Rullian and Mr. Gray, plaintiffs claim that Mr. O'Rullian and Mr. Gray violated plaintiffs' right to be free of malicious prosecution without probable cause as to counts two and three.  Plaintiffs claim they were denied "the right to be prosecuted fairly" based on a known lack of evidence against them.

Mr. O'Rullian and Mr. Gray correctly note that probable cause to prosecute count two is established by the collateral estoppel effects of the probable cause determination at the criminal action's preliminary hearing.  Even with all facts viewed in their favor, plaintiffs can point to no constitutional violation in that probable cause supported prosecution of count two.  Moreover, neither Mr. O'Rullian nor Mr. Gray violated plaintiffs' rights as to probable cause for count two in that Mr. Smith, not Mr. O'Rullian or Mr. Gray, initiated the prosecution and there is an absence of evidence to raise an inference that Mr. O'Rullian and Mr. Gray engaged in deception or acted with malice.

To recap, Mr. Smith declared that he "made the decision that probable cause existed to prosecute" plaintiffs "independent" of Mr. O'Rullian and Mr. Gray.  Mr. Smith further declared that he "solely" decided to prosecute plaintiffs on count two after Mr. Smith reviewed documentation from Mr. O'Rullian and Mr. Gray and including written reports, photographs, interviews, and laboratory results.  Mr. Smith further visited and observed plaintiffs' properties.  As to reports which Mr. O'Rullian provided to Mr. Smith, Mr. O'Rullian did not note violations of California Health and Safety Code section 25189.5, count two's operative statute.  Mr. O'Rullian further declares that he was unaware that Mr. Smith intended to prosecute plaintiff for violations of California Health and Safety Code section 25189.5 and that he neither saw nor reviewed the criminal complaint prior to its filing.

Mr. Gray notes his passing connection to count two.  Although Mr. Gray inspected plaintiffs' properties with other law enforcement officials, he prepared no reports.  Like Mr. O'Rullian, Mr. Gray was unaware that Mr. Smith intended to prosecute plaintiffs for violation of Health & Safety Code section 25189.5 and neither saw nor reviewed the criminal complaint prior to its filing.  Mr. Gray points out that after he reviewed the criminal complaint, he brought to Mr. Smith's attention a question about laboratory results regarding presence of hazardous waste.  Mr. Smith declares that his pleading of count

two "did not solely depend on the liquid in the tank," which was the subject of the laboratory results, in that "there was illegal disposal of waste oil which had been diluted with other substances." Mr. Gray correctly indicates that he "tried to provide exculpatory information to Smith regarding the charging allegations of Count II."

Turning to count three, Mr. O'Rullian and Mr. Gray correctly note that probable cause to prosecute count three is established by the collateral estoppel effects of the probable cause determination at the criminal action's preliminary hearing. As such, plaintiffs can point to no constitutional violation in that probable cause supported prosecution of count three. Moreover, neither Mr. O'Rullian nor Mr. Gray violated plaintiffs' rights as to probable cause for count three in that Mr. Smith, not Mr. O'Rullian or Mr. Gray, initiated the prosecution and there is an absence of evidence to raise an inference that Mr. O'Rullian and Mr. Gray engaged in deception or acted with malice. Mr. Smith declared that he conducted "an independent investigation" regarding count three and interviewed Ms. Kinney and Ms. Honeycutt. Count three is independent of Mr. O'Rullian and Mr. Gray's environmental health duties, and there is an absence of evidence that Mr. O'Rullian or Mr. Gray influenced Mr. Smith to charge plaintiffs with count three. Mr. Gray had no connection to events surrounding count three.

Considering the materials submitted by the parties and viewing facts in plaintiffs' favor, there is no evidence that Mr. O'Rullian and Mr. Gray violated plaintiff's constitutional rights relative to probable cause to prosecute counts two and three. With no violation of a constitutional right, this Court need not address whether alleged violated rights were clearly established. Mr. O'Rullian and Mr. Gray are entitled to qualified immunity as to plaintiffs' malicious prosecution claims.

### *Monell* **Liability**

Although their complaint is unclear, plaintiffs appear to attempt to allege a *Monell* claim against EHS. As to EHS, plaintiffs' complaint appears to allege that EHS management created a policy to punish plaintiffs financially and emotionally. Plaintiffs vaguely claim that Mr. O'Rullian "created, dictated and enforced the governmental policy for the entity of which he as employed" and that Kern County through EHS leaders "endorsed" Mr. O'Rullian's conduct. EHS argues there is no *Monell* liability in the absence of a constitutional violation arising from an EHS policy or custom or evidence that Mr. O'Rullian was an authorized decision maker to impose *Monell* liability on EHS.

A local government unit may not be held liable for the acts of its employees under a respondeat superior theory. *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978); *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 275 (1991); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989). The local government unit "itself must cause the constitutional deprivation." *Gilette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345 (1993). Because liability of a local governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go beyond the respondeat superior theory and demonstrate the alleged constitutional violation was the product of a policy or custom of the local governmental unit. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-480, 106 S.Ct. 1292 (1986). To maintain a section 1983 claim against a local government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Monell*, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

A plaintiff can establish a "policy or custom" by showing: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Gable*, 296 F.3d at 537; *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 735 (7th Cir. 1994). "[O]fficial policy must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445 (1981) (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018)); *see Rizzo v. Goode*, 423 U.S. 362, 370-377, 96 S.Ct. 598 (1976) (general allegation of administrative negligence fails to state a constitutional claim cognizable under section 1983). A "plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bryan County Commissioners v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382 (1997). A plaintiff must demonstrate that a defendant's policy was "closely related to the ultimate injury." *Harris*, 489 U.S. at 391, 109 S.Ct. at 1206. "At the very least

30

1  there must be an affirmative link between the policy and particular constitutional violation." *Oklahoma*
2  *City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427 (1985).

3      EHS correctly points to the absence of a constitutional violation to support *Monell* liability. EHS
4  correctly notes that plaintiffs have neither pled nor identified an express EHS policy or widespread
5  practice to cause their alleged constitutional deprivation. EHS argues that the record reveals nothing to
6  suggest a causal relationship between an EHS or Kern County custom, policy or practice and plaintiffs'
7  alleged injuries. Plaintiffs' reference that Mr. O'Rullian spoke daily to his EHS supervisor regarding
8  plaintiffs fails to establish an issue of fact regarding *Monell* liability. The record is devoid of evidence
9  of an alleged constitutional violation arising from an policy, custom or widespread practice. Plaintiffs
10  admit that Kern County's employment of Mr. O'Rullian "is insufficient to impose *Monell* liability."

11      Plaintiffs appear to rest their *Monell* claim on Mr. O'Rullian although plaintiffs present no
12  evidence that he was a policymaker. EHS contends that Mr. O'Rullian, as an environmental specialist,
13  was not a policymaker to invoke *Monell* liability in that he was neither part of EHS management nor
14  authorized to make Kern County policy.

15      A "rule or regulation promulgated, adopted, or ratified by a local governmental entity's
16  legislative body unquestionably satisfies *Monell*'s policy requirements." *Thompson*, 885 F.2d at 1443.
17  Official policy may derive from "a decision properly made by a local governmental entity's authorized
18  decisionmaker – i.e., an official who 'possesses final authority to establish [local government] policy
19  with respect to the [challenged] action.'" *Thompson*, 885 F.2d at 1443 (quoting *Pembaur*, 475 U.S. at
20  481, 106 S.Ct. at 1299 (plurality opinion)). To the extent that "policy" and "custom" imply something
21  beyond a single decision, official liability may be imposed "where a first-time decision to adopt a
22  particular course of action is directed by a governmentally authorized decisionmaker." *Larez v. City of*
23  *Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

24      There is an absence of evidence that Mr. O'Rullian, an environmental specialist, is an authorized
25  decisionmaker to invoke *Monell* liability. Plaintiffs raise no factual issue that Mr. O'Rullian had
26  requisite authority to establish a policy regarding action challenged by plaintiffs. Plaintiffs improperly
27  attempt to rest *Monell* liability on Mr. O'Rullian.

28                              **CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1.    GRANTS summary judgment for defendants William O'Rullian, Terry Gray and Kern County Environmental Health Services Department;

2.    VACATES the May 15, 2006 trial; and

3.    DIRECTS this Court's clerk to enter judgment in favor of defendants William O'Rullian, Terry Gray and Kern County Environmental Health Services Department and against plaintiffs Leroy Edwards, Kenneth Edwards and Roxanne Ayala.

IT IS SO ORDERED.

**Dated:   March 28, 2006**                    **/s/ Lawrence J. O'Neill**
66h44d                                          UNITED STATES MAGISTRATE JUDGE